**CABLE NEWS NETWORK, INC.,**
**Plaintiff–Appellee,**

v.

**VIDEO MONITORING SERVICES OF AMERICA, INC., Defendant–Appellant.**

No. 90–8798.

United States Court of Appeals,
Eleventh Circuit.

Sept. 4, 1991.

See also 723 F.Supp. 765.

Christopher P. Bussert, Jerre B. Swann, Kilpatrick & Cody, Atlanta, Ga., Daniel J. Goldstein, Bruce P. Keller, DeBevoise & Plimpton, New York City, for defendant-appellant.

William T. Plybon, June Ann Kirkland, Troutmen, Sanders, Lockerman & Ashmore, Atlanta, Ga., for plaintiff-appellee.

Before FAY and BIRCH, Circuit Judges, and HOFFMAN *, Senior District Judge.

BIRCH, Circuit Judge:

The technologically-induced collision between the free speech doctrine and a broadcast media-owned copyright produced the dispute in this lawsuit. In this interlocutory appeal by Video Monitoring Services, Inc. ("VMS") from the grant of a preliminary injunction in favor of Cable News Network, Inc. ("CNN") predicated on a claim of copyright infringement, we are asked to review both the propriety of the remedy as well as its scope. After the United States District Court for the Northern District of Georgia ("the district court") entered the disputed injunction, the Supreme Court rendered its unanimous decision in *Feist Publications, Inc. v. Rural Tele. Serv. Co.*, — U.S. —, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991). Our consideration of that decision, together with other authority in the law of copyright, requires us to REVERSE the grant of the preliminary injunction and to REMAND the case to the district court.

## BACKGROUND

### Factual Background

CNN is in the business of producing news reports which are broadcast and distributed via satellite to viewers throughout the United States and approximately sixty-five foreign countries. CNN licenses its broadcast services to cable television systems and others, who pay a fee to CNN for

---

* Honorable Walter E. Hoffman, Senior U.S. District Judge for the Eastern District of Virginia, sitting by designation.

receipt of its transmission programs.[1] CNN's programming generally consists of live news reporting with the use of prerecorded videotape segments throughout. This programming, on a domestic level, is composed of two distinct presentations. The first, known as "Cable News Network," provides comprehensive up-to-the-minute coverage of domestic and international news, sports, business and weather ("the basic coverage"). The second programming service offered by CNN is known as Headline News, which provides a more concise version of the basic coverage on a periodic cycle ("Around the world in thirty minutes.").

The Cable News Network programming, in addition to the basic coverage, also consists of supplemental broadcasts embracing a variety of special programming covering topics such as finance, health care, and consumer topics. Included in this category are such programs as "Crossfire", "Evans and Novak", "Your Money", and "Larry King Live." All of the transmission programming for CNN is taped each day in its entirety at the time that it is telecast.[2] Two recordings are made: one "air check" is made by a CNN production assistant, which is retained for one week and then erased; the other is made by the CNN engineering department and is retained for three and one-half years, then recycled. In addition to these two recordings, a number of specific programs are taped and retained by CNN. Included in the latter category are tapes of the "Crossfire" and "Larry King Live" segments. These reproductions are kept for one year, with certain selected segments retained indefinitely.

Those portions of CNN's broadcast day which appear as prerecorded segments fall into several different categories relative to classification for the purpose of copyright analysis. First, there are commercial advertisements or messages which solicit the acquisition of some good or service by the viewer. These commercials are produced by an advertiser and supplied to CNN to be broadcast at certain times. The amount paid to CNN for presentation of these commercials depends in part on the day and hour displayed as well as the length of the commercial segment. Second, many newsworthy events captured on videotape (having an audio and video component or both) are displayed, typically with a commenta-

---

**1.** The type of activity engaged in by CNN falls within the definitions of the Copyright Act of 1976 ("the Act") relative to "transmission program" and "transmit." 17 U.S.C. § 101. Those and related definitions provide:

A "transmission program" is a body of material that, as an aggregate has been produced for the sole purpose of transmission to the public in sequence and as a unit.

To "transmit" a performance or display is to communicate it by any device or process whereby images or sounds are received beyond the place from which they are sent.

To perform or display a work "publicly" means—

(1) to perform or display it at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered; or

(2) to transmit or otherwise communicate a performance or display of the work to a place specified by clause (1) or to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times.

To "perform" a work means to recite, render, play, dance, or act it, either directly or by means of any device or process or, in the case of a motion picture or other audiovisual work, to show its images in any sequence or to make the sounds accompanying it audible.

To "display" a work means to show a copy of it, either directly or by means of a film, slide, television image, or any other device or process or, in the case of a motion picture or other audiovisual work, to show individual images nonsequentially.

"Audiovisual works" are works that consist of a series of related images which are intrinsically intended to be shown by the use of machines or devices such as projectors, viewers, or electronic equipment, together with accompanying sounds, if any, regardless of the nature of the material objects, such as films or tapes, in which the works are embodied.

**2.** This undertaking is an apparent attempt by CNN to comply with the fixation requirement of 17 U.S.C. § 102(a) in order to secure copyright protection. The definition of "fixed" in section 101 includes the following: "A work consisting of sounds, images, or both, that are being transmitted, is 'fixed' for the purposes of this title if fixation of the work is being made simultaneously with its transmission."

tor's voice audible contemporaneously. Such disparate events include: news conferences by the President or other government officials; natural disasters including fire, earthquake, flood or storm; warfare involving other nations as well as our own; a motorist taken into custody by police and subjected to a beating; the effects of disease and famine on the world's populations; the funeral or wedding of a public figure; a collegiate or professional sporting event; and a debate or hearing in Congress or in a state or local legislative body. Finally, certain segments, like the one at issue here, are entirely prerecorded; that is, they do not consist of a mix of "live" commentary contemporaneously delivered with prerecorded segments, with both being transmitted simultaneously.

CNN has licensed Radio TV Reports, Inc., one of VMS's competitors, to make and license to the public CNN's programming and transcripts of that programming. In addition, requests for copies of CNN programming are referred to CNN Library Tape Sales, a CNN unit which exists to license CNN programming to third parties. Turner Educational Services, Inc., a CNN affiliate, also distributes tapes of certain CNN programming to various licensees for use in the educational and public library markets.

Defendant VMS is a national video monitoring service that monitors television programming nationwide, including CNN's, and provides copies of program segments and other information requested by its clients. Before the preliminary injunction was issued, VMS taped all Cable News Network transmission programming, seven days a week, twenty-four hours a day. CNN represents that VMS's books and records disclose that during 1988, VMS's New York office recorded approximately 2,502 separate sales of CNN transmission programming generating approximately $300,000 in sales. This is not disputed by VMS. It is also undisputed that CNN has not licensed VMS to make or sell copies of

its transmission programming. In an affidavit, CNN's deputy general counsel, Benita Baird, indicates that she made several oral requests of VMS to cease and desist from copying CNN's transmission programming. Attached to her affidavit is a copy of her March 12, 1985 letter, on the stationary of Turner Broadcasting System, Inc., on behalf of CNN wherein VMS is instructed to discontinue its practice of videotaping CNN's transmission programming. A copy of the Baird letter follows as Appendix A.[3]

VMS's president, Robert J. Cohen, stated that an important aspect of its business is monitoring the programming that appears on the over-the-air and cable television networks and that VMS regularly provides its clients, which include Turner Broadcasting Services, Inc. and the Justice Department, with information gleaned from reviewing videotapes made as a part of the monitoring process. Cohen further stressed that "[w]ithout the ability to make videotapes, monitoring cable and over-the-air television programming nationwide, on a daily, around-the-clock basis, would be physically and economically impossible." R3–48–3 (Cohen affidavit). VMS is employed by the copyright owners of certain commercials and news releases who do business with CNN to record and monitor the use of their copyrighted work by CNN. This is done to provide those copyright owners with information and verification relative to the time of broadcast, the content of broadcast and the context in which the broadcast occurred.

*Procedural History*

This action was initiated on November 23, 1988 when CNN claimed ownership of a copyright in a certain thirty-minute television broadcast identified as the October 17, 1988 program segment, "Crossfire" ("the Segment"). CNN complained that VMS had copied the Segment and sold the copy. CNN alleged that it possessed "all rights of copyright" in the Segment. R1–

**3.** The circuit court opinion alluded to in that letter is *Pacific & Southern Co. v. Duncan,* 744 F.2d 1490 (11th Cir.1984), *cert. denied,* 471 U.S. 1004, 105 S.Ct. 1867, 85 L.Ed.2d 161 (1985). We note that this letter does not meet the requirements for an "Advance Notice Of Potential Infringement" under 37 C.F.R. § 201.22.

1–3. Evidencing CNN's claim of copyright in the Segment is a copy of CNN's certificate of registration, identification number PAu 1–136–813, which is attached to the complaint.

The application[4] for registration of CNN's claim of copyright was signed by CNN vice president Steven W. Korn on October 17, 1988 and was received by the Registrar of Copyrights on October 17, 1988. A copy of that application and registration certificate follows as Appendix B. The copyrighted work was described by Korn as a "motion picture" entitled alternately as "Crossfire" or "Barry Goldwater: Mr. Conservative." R1–1–Exhibit A. The name of the author was given as "Cable News Network, Inc." and the work was identified as a "work made for hire." *Id.* Thus, the "entire work" was identified by Korn as the result of the efforts of, presumably, certain CNN employee(s).[5] Additionally, we observe that section 6 of the

application form entitled "Derivative Work Or Compilation" was left blank. *Id.*

Under the first count of the complaint for "copyright infringement," [6] CNN stated that it was "entitled, pursuant to 17 U.S.C. § 502, to injunctive relief to prevent VMS from selling or otherwise distributing videotapes, transcripts, or other copies, in any form, *of any of CNN's programming, or any part or portion thereof,* and from otherwise infringing *any copyright* interest of CNN ..." R1–1–6, ¶ 21(a) (emphasis added). Thereafter, VMS filed a motion to dismiss and asserted a lack of personal jurisdiction and improper venue. That motion subsequently was denied by the district court.[7] While the motion was pending, however, CNN filed its motion for a preliminary injunction seeking an order enjoining VMS "from copying or selling copies of any of CNN's programming, either in whole or in part." R1–17–1. In support of

---

**4.** The application form for registration of a claim of copyright, pursuant to 17 U.S.C. §§ 409 and 410, is stamped and completed by the Copyright Office in the upper right corner, where the identifying number is placed. One does not "obtain" a copyright from the Copyright Office. A claimant merely registers its claim of copyright in a work with the Copyright Office. Copyright itself arises by operation of law when any original work of authorship is fixed in a tangible medium of expression from which it can be perceived. 17 U.S.C. § 102(a). As indicated in the statute, the "registration is not a condition of copyright protection." 17 U.S.C. § 408(a). However, as discussed in detail hereinafter, registration is a prerequisite to initiation of an action for infringement. 17 U.S.C. § 411(a).

**5.** We presume that employees of CNN recorded the sounds and images which constituted the broadcast of the Segment, thereby conferring "authorship" status on CNN by operation of law under 17 U.S.C. §§ 101 ("work made for hire" definition) and 201(b) (constructive transfer). The copyright registration form also indicates that at the time of application for registration of its claim of copyright in the Segment, CNN had not yet published that work since section 3 of the form, where the date of first publication is to be provided, was left blank. R1–1–Exhibit A. Moreover, the lower case "u" which follows "PA" in the registration number at the top right of the registration certificate signifies the unpublished nature of the work. This is consistent with the definition of "publication" under 17 U.S.C. § 101. The mere broadcast of the Segment over the airwaves did not constitute "publi-

cation." However, in this case, given the date of receipt of the application by the Copyright Office and the date that the Segment was transmitted on-the-air, the Segment apparently was prerecorded for later broadcast. Hence, the transmission of the Segment on October 17, 1988, was not a "live" transmission. Nevertheless, even where the first recording or "fixation" takes place simultaneously with its transmission, CNN would also qualify as the "copyright owner." *See* 37 C.F.R. § 201.22(a)(2).

**6.** The three remaining complaint counts, asserting claims predicated upon unauthorized publication or use of communications under 47 U.S.C. § 605 (count two), deceptive trade practices under O.C.G.A. § 10–1–372(a) (count three) and common law unfair competition and misappropriation (count four) are not involved in this appeal. The district court based its grant of injunctive relief on the copyright infringement claim only. R2–29–7. Moreover, to the extent that CNN's other non-federal claims seek to prevent the copying of its putative copyrighted work, such claims would be preempted by the Copyright Act of 1976. 17 U.S.C. § 301; *see Compco Corp. v. Day Brite Lighting, Inc.,* 376 U.S. 234, 237, 84 S.Ct. 779, 782, 11 L.Ed.2d 669 (1964); *Donald Frederick Evans & Assoc. v. Continental Homes, Inc.,* 785 F.2d 897, 913–14 (11th Cir.1986); *Crow v. Wainwright,* 720 F.2d 1224 (11th Cir.1983), *cert. denied,* 469 U.S. 819, 105 S.Ct. 89, 83 L.Ed.2d 35 (1984).

**7.** The ruling on VMS's motion to dismiss is not before us on this interlocutory appeal from the grant of the preliminary injunction.

CNN's motion, several affidavits of CNN employees were submitted.[8] After briefing, the district court entered an order holding in abeyance disposition of CNN's motion for injunctive relief until discovery on the issue of personal jurisdiction could be completed. The district court entered an order on January 4, 1990 denying VMS's motion to dismiss and granting CNN's motion for preliminary injunction, and specifically stated in its order: "By its motion for preliminary injunction, plaintiff seeks an order enjoining defendant 'from copying or selling copies of any of [plaintiff's] programming.'" R2-29-7. The injunction was not to be effective until CNN posted a bond of $80,000. That bond was taken and approved on February 7, 1990. A notice of appeal was filed by VMS on February 15, 1990, pursuant to 28 U.S.C. § 1292(a)(1). Prior to granting the preliminary injunction in this case the district court did not require CNN to file a copy of the videotape of the work[9] described in the registration certificate; that is, the October 17, 1988 "Crossfire" segment entitled "Barry Goldwater: Mr. Conservative."

On February 21, 1990, VMS filed a motion to clarify and amend judgment. The thrust of that motion was that "[t]he injunction language proposed by CNN— which it claims has already been adopted by the [c]ourt—is improper and overbroad because it prohibits far more activity that [sic] allegedly infringes CNN's copyrights." R3-37-3. In support of that motion, VMS submitted the affidavit of Anthony F. Lo Cicero ("Lo Cicero affidavit"), an attorney for VMS, wherein he recounted his communications with CNN's attorneys asserting that CNN's "reading of the Order is that it enjoins VMS from copying

CNN's programming immediately upon posting of the Bond. Therefore, no additional pleadings or orders need be filed in the case to effectuate the injunction." R3-38-4 (letter from William T. Plybon, Esq. to Anthony F. Lo Cicero, Esq. dated February 7, 1990). Also filed in support of VMS's motion to clarify and amend was the affidavit of Cohen, ("Cohen affidavit"). R3-48.

On July 10, 1990, the district judge entered an order, *inter alia*, denying VMS's motion to clarify and amend judgment "Inasmuch as defendant's motion to clarify and amend judgment is nothing more than a disguised attempt to have this court reconsider its January 4, 1990 order granting plaintiff's motion for preliminary injunction, the same is hereby DENIED." R3-52-1. On August 17, 1990, VMS filed its notice of appeal with respect to the July 10, 1990 order, pursuant to 28 U.S.C. § 1292(a)(1). Upon motion of VMS, its first appeal initiated on February 15, 1990, designated as No. 90–8205, was dismissed by the clerk of our court on August 24, 1990. The later appeal, therefore, remained.

## DISCUSSION

### The Issues Presented

On appeal, VMS complains that the injunctive relief granted by the district court whereby VMS is enjoined "'from copying or selling copies of any of [plaintiff's (CNN's)] programming'" is improper and should be set aside. R2-29-7. In support of its challenge, VMS asserts that the injunction is vague and overbroad and fails to comport with Fed.R.Civ.P. 52(a) and 65(d). CNN counters stating that "[t]his case involves facts and legal issues virtually identical to those previously presented

---

**8.** The following affidavits were filed by CNN: affidavit of Benita Baird, Deputy General Counsel, News and Operations for Turner Broadcasting System, Inc. ("Baird affidavit"); affidavit of Felecia McDuffie, a legal assistant with Turner Broadcasting System, Inc. ("McDuffie affidavit"); and affidavit of Kathy Christensen, director of the CNN Library ("Christensen affidavit"). R1–17.

**9.** CNN was required to forward, together with its application for registration of its copyright claim in the Segment, a deposit in the form set

out in 17 U.S.C. § 408(b) and 37 C.F.R. §§ 202.-20. Pursuant to 37 C.F.R. § 202.20(c)(2)(ii): Motion pictures ... "The deposit of a copy or copies for any published or unpublished motion picture must be accompanied by a separate description of its contents, such as a continuity, pressbook, or synopsis." Alternatively, CNN could have satisfied the deposit requirement by complying with 37 C.F.R. § 202.21(g). The record also does not reflect the inclusion of any such synopsis.

and ruled on by this [c]ourt in" *Pacific & Southern Co. v. Duncan,* 744 F.2d 1490 (11th Cir.1984) ("WXIA I"), *cert. denied,* 471 U.S. 1004, 105 S.Ct. 1867, 85 L.Ed.2d 161 (1985), *on remand,* 618 F.Supp. 469 (N.D.Ga.1985), *aff'd,* 792 F.2d 1013 (11th Cir.1986) ("*WXIA II*"). CNN's initial brief on appeal, 6–7. However, a close examination of our decision in *WXIA II* discloses that the issue relative to injunctive relief is not the same issue presented in this case. As the panel specifically stated in *WXIA II:* "As for the future possibility that Ms. Duncan may wish to provide news summaries to clients as a 'broadcast monitor,' we must decline to offer an advisory opinion." 792 F.2d at 1015. In the instant case, VMS *is* a broadcast monitor and videotapes the transmission programming of the major networks, including CNN. Such copying and monitoring is an integral and necessary part of its business. The parties do not dispute that the scope of the present injunction would prohibit VMS from accomplishing such videotaping without violating the order and that the disputed injunction reaches the whole and every part of each broadcast day of CNN including future broadcasts. Accordingly, the scope of the copying actually involved in *WXIA II* is significantly different than that presently before this court. Moreover, since the opinion in *WXIA II* the Supreme Court has addressed and clarified the law of copyright [10] and thereby has removed any doubt concerning the appropriate scope of injunctive relief that may have been suggested by *WXIA II. See Feist Publications, Inc. v. Rural Tele. Serv. Co.,* — U.S. —, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991). To the

extent that CNN seeks to rely upon the language of footnote 17 in *WXIA I,* 744 F.2d at 1499 n. 17, we note that that language is manifestly *obiter dicta* and, as discussed below, its analysis is incomplete and contrary to the teachings of *Feist.*[11]

While motions for summary judgment remain pending in the district court, we observed in *Alabama v. United States Environmental Protection Agency,* 871 F.2d 1548, 1554 (11th Cir.), *cert. denied,* — U.S. —, 110 S.Ct. 538, 107 L.Ed.2d 535 (1989): "However, [the district court's grant of summary judgment] did not divest this Court of its jurisdiction over the interlocutory appeal of the preliminary injunction. *See generally Griggs v. Provident Consumer Discount Co.,* 459 U.S. 56, 103 S.Ct. 400, 74 L.Ed.2d 225 (1982) (per curiam). Although the injunction itself did not survive the grant of summary judgment and dismissal, *Cypress Barn, Inc. v. Western Electric,* 812 F.2d 1363 (11th Cir.1987), we still have jurisdiction over this appeal." Accordingly, we address the issues presented by this appeal.

*Standard of Review*

We review the district court's grant of a preliminary injunction to determine whether that court abused its discretion. *Guaranty Fin. Servs., Inc. v. Ryan,* 928 F.2d 994, 998 (11th Cir.1991). "However, if the trial court has misapplied the law, we must review and correct the error without deference to that court's determination of the legal issue." *Id.; Tally–Ho, Inc. v. Coast Community College Dist.,* 889 F.2d 1018, 1022 (11th Cir.1990). As discussed in detail below, our review of the district

---

**10.** Previous decisions of this circuit are binding on subsequent panels unless overruled by this circuit sitting en banc, or called into question by intervening Supreme Court precedent. *Smith v. Duff & Phelps, Inc.,* 891 F.2d 1567, 1570 (11th Cir.1990); *County of Monroe, Florida v. Dept. of Labor,* 690 F.2d 1359, 1363 (11th Cir.1982).

**11.** In *WXIA I* the court was presented with a copyright infringement case where the district court had declined to afford injunctive relief to the copyright owner. Accordingly, the scope of injunctive relief was never at issue in that case. The scope of injunctive relief, however, did present itself in *WXIA II* where the panel de-

clined to reach the issue presented in this case relative to the videotaping of entire broadcast days by the alleged infringer. Nevertheless, in footnote 17, the panel in *WXIA I* indicated that: "The district court in this case had the power to issue [an injunction against the use of unregistered works] because the statute provides for injunctions to prevent infringement of '*a* copyright' (emphasis added), not necessarily the registered copyright that gave rise to the infringement action.... To refuse injunctive relief under these conditions would render meaningless the fact that registration is 'not a condition of copyright protection.' 17 U.S.C.A. § 408(a) (1977)." *WXIA I,* 744 F.2d at 1499 n. 17.

court opinion discloses errors of law that compel reversal. "To prevail on its motion for a preliminary injunction, [CNN] has the burden of proving: (1) *a substantial likelihood of success on the merits;* (2) a substantial threat of irreparable injury; (3) its own injury outweighs the injury to [VMS]; and (4) *the injunction would not disserve the public interest." Tally–Ho,* 889 F.2d at 1022 (emphasis added).

### Copyright's Changing Landscape

This case illustrates the situation in which rights under the Copyright Clause of the United States Constitution, article 1, section 8, clause 8, collide with the First Amendment's right of free speech. The emergence of certain modern developments in the areas of copyright, First Amendment law, and technology presaged and ordained this collision. These legal developments embrace: (1) the interpretation of the First Amendment recognizing that free speech encompasses the right of access to the free flow of ideas; and, (2) the elimination of the requirement of publication as a condition for statutory copyright, thereby ensuring public access. The advent of new communications technology has blurred the distinction between product and process, a distinction which served as a practical limitation on a copyright owner's right to limit access to the work (i.e., product). The printing of a book, the traditional focus of copyright protection, did not lead to confusion between the product (the book) and the process (the printing). However, such a clear delineation is not apparent with respect to a television broadcast, where process and product are intertwined. Moreover, these same advances of technology provide the ability to make copies quickly, remotely, cheaply and anonymously. This confluence of legal and technological developments created the conditions that gave rise to this case.

Copyright simultaneously has two aspects, one proprietary and the other regulatory. As noted by Professor L. Ray Patterson:

> Copyright's basis as a proprietary concept is that it enables one to protect his or her own creations. Its regulatory basis is that when these creations constitute the expression of ideas presented to the public, they become part of the stream of information whose unimpeded flow is critical to a free society.

Patterson, *Free Speech, Copyright, and Fair Use,* 40 Vanderbilt L.Rev. 1, 5 (1987).

Traditionally the courts have approached the resolution of copyright issues from a proprietary perspective. However, the recent Supreme Court decision in *Feist* mandates a shift from this traditional focus and compels examination of such issues, particularly where free speech concerns are implicated, also from a regulatory perspective. In so doing, it may be possible to arrive at a point of balance between the Copyright Clause and the First Amendment that harmonizes the underlying concerns of the founding fathers embodied in our constitutional legacy.

The Copyright Clause itself describes the concept of copyright intended by its framers; that is, the grant of an exclusive right to authors to reproduce their writings for sale during a limited period of time in exchange for the author's making the work available to the public in order to promote learning.[12] This *quid pro quo* reflects a fundamental fairness to both the public, the "owner" of the public domain, and the author who takes from the public domain the ideas which are the substance of such author's protected original expression.[13]

---

**12.** It is axiomatic that learning relative to a work requires access to the work in which the ideas are included, therein originally expressed, during the limited period (i.e., the term of copyright). This represents one of two significant policies embodied in the Copyright Clause. The other fundamental policy is that ultimately copyrighted works enter the public domain where they become freely accessible to the public.

**13.** The Copyright Act recognizes these relative positions in Section 102(b) which delineates the subject matter of copyright: "In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated or embodied in such work."

This view of copyright protection is in harmony with the First Amendment doctrine that free speech encompasses " 'public access to discussion, debate and dissemination of information and ideas.' " *Board of Education v. Pico,* 457 U.S. 853, 866, 102 S.Ct. 2799, 2808, 73 L.Ed.2d 435 (1982) (plurality) (quoting *First Nat'l Bank of Boston v. Bellotti,* 435 U.S. 765, 783, 98 S.Ct. 1407, 1419, 55 L.Ed.2d 707 (1978)); *see Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council,* 425 U.S. 748, 756, 96 S.Ct. 1817, 1823, 48 L.Ed.2d 346 (1976) ("[T]he protection afforded is to both the communication, to its source and to its recipients both.").[14] In order to maintain this harmony, it is instructive in cases where First Amendment and Copyright Clause rights are presented to analyze from both the proprietary and regulatory perspectives described above. Accordingly, we will endeavor to review the issues in the instant case from both perspectives in an effort to reach a balanced resolution that will maintain the integrity of the First Amendment and the Copyright Clause principles involved.

This balancing concept is nothing new, particularly in the field of copyright law. In the "Forward" to Benjamin Kaplan's *An Unhurried View of Copyright,* (1967) (*"Forward"*), William C. Warren, then Dean of the Faculty of Law at Columbia University, observed:

> Copyright protection became necessary with the invention of the printing press and had its early beginnings in the British censorship laws. The fortunes of the law of copyright have always been closely connected with freedom of expression, on the one hand, and with technological improvements in means of dissemination, on the other. Successive ages have drawn different balances among the interest of the writer in the control and exploitation of his intellectual property, the related interest of the publisher, and the competing interest of society in the untrammeled dissemination of ideas. It is this striking of balances in the law of copyright in the past, at present, and for the future, which constitutes the central theme of the James S. Carpentier Lectures delivered by Professor Benjamin Kaplan at the Columbia University School of Law in March, 1966. *His counsel that greater emphasis should be placed on the public's interest in the free accessibility of ideas is particularly appropriate in an era when freedom of expression is frequently under attack and when the means of dissemination of ideas are increasingly concentrated in fewer hands.*

*Forward* at vii-viii (emphasis added).

As Mr. Justice Fortas recognized in the opening remarks of his dissent in one of the first landmark cases in which copyright law was applied to contemporary communications technology: "This case calls not for the judgment of Solomon but for the dexterity of Houdini." *Fortnightly Corp. v. United Artists Television,* 392 U.S. 390, 402, 88 S.Ct. 2084, 2091, 20 L.Ed.2d 1176 (1968) (Fortas, J., dissenting).[15] Based upon the copyright registration of a single 30–minute segment of CNN's 24–hour–a–day transmission programming, the district court entered an injunction. The order quoted CNN's motion and enjoined VMS " 'from copying or selling copies of any of [plaintiff's (CNN's)] programming.' " R2-

---

**14.** As Justice O'Connor reminded us in *Feist Publications, Inc. v. Rural Tel. Serv. Co.:*
> More than a century ago, this Court observed: "The very object of publishing a book ... is to communicate to the world the useful knowledge which it contains. But this object would be frustrated if the knowledge could not be used without incurring the guilt of piracy of the book." *Baker v. Selden,* 101 U.S. 99, 103, 25 L.Ed. 841 (1880).

—— U.S. ——, ——, 111 S.Ct. 1282, 1290, 113 L.Ed.2d 358 (1991).

**15.** It is interesting to note that the ruling in *Fortnightly* eliminated copyright impediments to development of the cable television industry by approaching the interpretation of the Copyright Act of 1909 from a public-benefit, regulatory perspective. It is indeed ironic that CNN, which owes its economic existence in large measure to this analytical approach, would have this court and the district court abandon such analysis in favor of the proprietary method of analysis which better accommodates its interests in this case. This is not the first time CNN has taken such an approach. *See United States v. Noriega,* 752 F.Supp. 1037, 1039–40 (S.D.Fla.1990).

29–7. At oral argument and in its brief, CNN maintains the position that the injunction prohibits VMS from copying any of its daily transmission programming, in whole or in any part, presently or in the future. As indicated above, CNN relies upon language in *WXIA I* (particularly footnote 17) and *WXIA II* as support for its position. For the reasons discussed earlier, and explained subsequently, such reliance is without foundation and is the epitome of overreaching condemned by Congress and criticized by copyright commentators. To approve of such a far-reaching, broad and inclusive form of injunctive relief both endangers free speech and is inconsistent with the law of copyright.

The power of the district court to grant injunctive relief springs from 17 U.S.C. § 502(a) which provides: "Any court having jurisdiction of a civil action arising under this title may ... grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." The operative words here are "having jurisdiction" and "copyright." Before a court can have jurisdiction to entertain an infringement action, the *prior* registration requirements of 17 U.S.C. § 411(a) must be met; that is, "no action for infringement of the copyright in *any* work shall be instituted until registration of the copyright claim has been made in accordance with this title." 17 U.S.C. § 411(a) (emphasis added); *see Cable/Home Communication Corp. v. Network Productions, Inc.*, 902 F.2d 829, 850 (11th Cir.1990). Accordingly, the scope of the *remedy* for copyright infringement is constrained and dictated by the scope of the copyright claim actually registered. Here the registration of the claim of copy-

right embraced the Segment *only*, the thirty-minute snapshot of a *portion* of CNN's transmission programming that comprises its broadcast day. CNN did not undertake, for whatever reasons, to register its claim of copyright in its broadcast day of October 17, 1988, or for that week, month or year. Moreover, the Segment is not even representative of CNN's basic programming but constitutes an example of its special programming. The Segment, by CNN's own admission, is uncharacteristic of the familiar news presentation in which prerecorded segments appear on the screen while the viewer receives audio commentary, interrupted by occasional commercial messages. Stated differently, the Segment is not the usual news, sports or weather broadcast reporting that constitutes the bulk of CNN's daily transmission programming and is embraced by the injunction. More significantly, the injunction is directed to future transmission programming.

■ Such relief assumes that one can enforce a remedy for infringement of: (1) unregistered claims of copyright in unpublished works; and, (2) putative copyrights in works which are not yet in existence. This notion is manifestly contrary to the basic concepts of copyright law and represents serious legal mischief. By advocating such theories, CNN seeks to obtain, and has lured the district court into granting, an injunctive remedy for unregistered claims of copyright and for putative copyrights in works not yet in existence. We shall address the future works theory first.

Since a "future" work, by definition, has not yet been created, it cannot be *"fixed,"* as that term is defined under 17 U.S.C. § 101.[16] Without fixation there can be no

---

**16.** Under the definition of "fixed" set out in 17 U.S.C. § 101, is the following direction relative to television broadcasts: "A work consisting of sounds, images, or both, that are being transmitted, is 'fixed' for the purposes of this title if a fixation of the work is being made simultaneously with its transmission." *See* note 1, *supra,* for the definition of "transmit."

The procedure under 17 U.S.C. § 411(b) and 37 C.F.R. § 201.22 (concerning "advance notice of potential infringement") is available to a broadcaster where the work is being transmitted "live" and the fixation is being accomplished

simultaneously for the first time. This section of the statute and regulation is generally attributed to the National Football League's (NFL) then Commissioner, Pete Rozelle. The NFL was concerned with enforcing its copyright to the telecast of live football games. *See National Football League v. Cousin Hugo's, Inc.,* 600 F.Supp. 84 (E.D.Mo.1984); *Copyright Law Revision—CATV: Hearings on S. 1006 Before the Subcomm. on Patents, Trademarks, and Copyrights of the Senate Comm. on the Judiciary,* 89th Cong., 2d Sess. 156–60 (1966) (statement of Pete Rozelle) (Commissioner Rozelle com-

copyright protection since "[c]opyright protection subsists ... in original works of authorship *fixed* in a tangible medium of expression ... from which they can be perceived, reproduced...." 17 U.S.C. § 102(a) (emphasis added). Also consistent with the premise that relief can be granted only for extant copyrights is 17 U.S.C. § 501(a) which provides: "Anyone who violates any of the exclusive rights of the copyright *owner* ... is an infringer of the copyright" (emphasis added). Until there is a copyright, there cannot be a copyright *owner*, and 17 U.S.C. § 501(b) limits an action for infringement to acts that occur while one is the owner. Alternatively, the concept of affording protection to works not yet in existence under some "equitable" concept granting protection to the efforts of an author, is antithetical to the teachings of *Feist*. The Court expressly rejected any "sweat-of-the-brow" or "industrious collection" theory of copyright protection. *Feist,* —— U.S. at ——, 111 S.Ct. at 1291–95. Rather, the Court emphasized that "[o]riginality remains the *sine qua non* of copyright [protection]." *Id.* at ——, 111 S.Ct. at 1289. Moreover, in rejecting the "industrious collection" doctrine, the Court also firmly rejected the notion that allowing free copying of facts was in any way "unfair" or "unfortunate." *Id.* at ——, 111 S.Ct. at 1290. The Court emphasized that "[t]he primary objective of copyright is *not* to reward the labor of authors, but '[t]o promote the Progress of Science and the useful Arts.' " *Id.* (quoting U.S. Const. art. I, § 8, cl. 8) (emphasis added). Thus, granting broad injunctive relief

based upon some "equitable" concept apart from the letter of the copyright law would be contrary to *Feist.*

An injunction which restrains the copying of a class of future works not yet created violates two important precepts. First, it enables copyright claimants to avoid registration,[17] a requirement which serves to maintain the copyright monopoly within the context of the promotion of learning, as mandated by the Copyright Clause, by assuring access to even unpublished works since the deposit is open to the public. Second, such an injunction affords generic protection for works which may or may not fulfill the constitutional requirement of originality. It is important to understand that while a court may enjoin the future infringement of copyrighted works, it does not follow that a court may enjoin the infringement of future works that are yet to be created. The type of injunction issued by the district court in this case would allow copyright claimants to use the legal system to secure copyright protection for public domain materials, an impermissible and significant departure from existing law.

Turning to the letter of the copyright law we must examine the propriety of affording injunctive relief for the infringement of unregistered copyrights in *existing* works; something the panel in *WXIA I,* by footnote, approved. As emphasized above, a copyright owner's compliance with 17 U.S.C. § 411(a) is a prerequisite to invoking the jurisdiction of the federal district court and pursuing any *remedy* for infringe-

---

plained about CATV systems receiving a home game broadcast from a distant television station and broadcasting it back to the home team's area, which had been "blacked-out" by the NFL). Since these special events were "spontaneous" and not taken from a script (i.e., a tangible medium in which an original written expression had already been fixed, thereby conferring copyright protection to derivative works), a procedure was devised to make available an infringement remedy to a "live" broadcast yet to be "fixed." However, even under this limited and narrow procedure registration has to be accomplished within three months of the work's first transmission. As noted above in footnote 3, CNN provided no such notice in this case. In any event, the Segment appears to have been

prerecorded and not "live," thereby falling outside the scope of 17 U.S.C. § 411(b).

17. The registration of a claim of copyright is uniquely important since the certificate issued by the Register of Copyrights carries with it significant legal presumptions: "In any judicial proceedings the certificate of registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate." 17 U.S.C. § 401(c). *See Donald Frederick Evans v. Continental Homes, Inc.,* 785 F.2d 897, 903 (11th Cir.1986); *Original Appalachian Artworks, Inc. v. Toy Loft,* 684 F.2d 821, 826 (11th Cir.1982).

ment. The dichotomy between copyright *protection* and *remedy* is apparent from the statutory language and is underscored in the pertinent legislative history. The House Report relative to the Copyright Act of 1976 relates, in pertinent part, as follows:

> Section 411. Registration as Prerequisite to Infringement Suit
>
> The first sentence of section 411(a) restates the present statutory requirement that registration must be made before a suit for copyright infringement is instituted. Under the bill, as under the law now in effect, *a copyright owner who has not registered his claim can have a valid cause of action* against someone who has infringed his copyright, *but he cannot enforce his rights in the courts until he has made registration.*
>
> \*   \*   \*   \*   \*   \*
>
> Section 411(b) is intended to deal with the special situation presented by works that are being transmitted "live" at the same time they are being fixed in tangible form for the first time. Under certain circumstances, where the infringer has been given advance notice, an injunction could be obtained to prevent the unauthorized use of the material included in the "live" transmission.

H.R.Rep. No. 1476, 94th Cong., 2d Sess. 157, *reprinted in* 1976 U.S.Code Cong. & Admin.News 5659, 5773 (emphasis added).

More recently Congress had occasion to focus on the registration requirement of 17 U.S.C. § 411(a) before the passage of the Berne Convention Implementation Act of 1988. The report of the House Committee on the Judiciary states, in pertinent part, as follows:

> It is the view of the Committee that any doubt on this issue should be resolved in favor of retaining section 411 of the Copyright Act because the provision is in the public interest. *Copyright registration promotes efficient litigation practices, to the benefit of* the courts and *the public* as well as to the parties in the lawsuit. *Registration narrows the issues that must be litigated* and, since it pertains to *proof of own-*

*ership,* assists the courts in resolving the underlying copyright dispute. Within the Congress, the Committee plays an important role in monitoring the judicial impact of legislation. In this regard, the Judicial Conference of the United States advise the Committee that if the requirement of registration as a prerequisite to suit were eliminated, there would likely be increased difficulty in trying copyright cases.

> \*   \*   \*   \*   \*   \*
>
> Moreover, registration as a prerequisite to suit helps to ensure the existence of a central, public record of copyright claims. This publicly available depository of information is of benefit to both copyright owners and users.
>
> *The Committee is also concerned that abolition of section 411(a) would result in attempts to use the legal system to exert control over materials that Congress intends to be in the public domain.* Since the *prima facie* presumption of originality in section 410(c) would continue to provide a strong incentive for registration, it would arguably be those claimants who do not have a cognizable claim to copyrightability who would forego the substantail [sic] benefits of registration: examples would include utilitarian, industrial and other works that do not meet the existing standards of protection.
>
> \*   \*   \*   \*   \*   \*
>
> For all of these reasons, the Committee concluded that section 411(a)—and registration as a prerequisite to the filing of a lawsuit—should be retained.

H.R.Rep. No. 609, 100th Cong., 2d Sess. 41–42 (1988) (emphasis added) (footnotes omitted). In *WXIA I* the panel, in footnote 17, suggests that to refuse injunctive relief to unregistered works would "render meaningless the fact that registration is 'not a condition of copyright protection.' 17 U.S.C.A. § 408(a) (1977)." 744 F.2d at 1499 n. 17. This conclusion places undue emphasis on a precatory statement, the purpose of which is apparently misunderstood, and renders meaningless the sub-

stantive provisions of 17 U.S.C. § 411(a). As noted in the legislative history of the Berne Convention Implementation Act of 1988:

> It can safely be stated that Congress drafted and passed the 1976 Act with a "weather eye" on Berne.
>
> \*     \*     \*     \*     \*     \*
>
> Divergent views do exist on the Berne compatibility of the requirement that claimants seek registration before copyright infringement suits.... H.R. 4262 proceeds upon the assumption that section 411 of the Copyright Act should not be changed since it is not clearly prohibited by Article 5(2) of the Berne Convention. *The requirement that registration occur as a precondition to a lawsuit is procedural in nature and does not in any sense lead to a "loss of copyright."*

H.R.Rep. 609, 100th Cong., 2d Sess., 21, 41 (1988) (emphasis added) (footnote omitted). Thus the last phrase of 17 U.S.C. § 408(a) merely reflected an effort by the drafters of the 1976 Copyright Act, exercising a "weather eye" to the Berne Convention, to avoid disqualification for imposition of "formalities for the recognition and protection of copyright." *Id.* at 12.

The Judiciary Committee's concern that abolition of the registration requirement would "result in attempts to use the legal system to exert control over materials that Congress intended to be in the public domain," *id.* at 42, is realized in cases like this. Here, an aggressive and overreaching copyright owner has seduced a court into affording it control over too broad a territory in which it seeks exclusive dominion. Frequently, the court is presented with a "good guy" copyright owner and a "bad guy" ("pirate") copyist. As a result, in affording relief, the interest of the public in the free flow and availability of ideas is often overlooked. In the instant case, had CNN registered a claim of copyright in a typical broadcast day, its registration application would have been compelled to identify under section 6a "any preexisting work or works that this work is based on or incorporates." *See* Appendix B; 17 U.S.C. § 409. Hence, all prerecorded segments and commercials, many of which are either in the public domain or are the copyrighted work of others, would have to be disclosed. More importantly, under section 6b, CNN would be required to "[g]ive a brief, general statement of the material that has been added to this work and in which copyright is claimed." *See* Appendix B; 17 U.S.C. § 409. A review of the registration certificate and the deposit materials [18] by the district court would have allowed it to fashion an injunctive remedy that balanced the rights of the copyright owner fairly against the rights of the public. Such a balance would permit access to unpublished works, control over which frequently lies exclusively in the hands of the broadcaster. Significantly, the only access which may exist to such material may be through the alleged infringer.

In this case, CNN asserts that access to copies of its programming can be obtained from its library and other sources. However, there is no statutory requirement that CNN or any other broadcaster retain copies of transmission programs. All that the law presently requires of such broadcast-

---

**18.** In this case the district court did not examine the deposit material to determine whether it met the test of originality sufficient for any copyright protection. The fact that VMS may have conceded such point is irrelevant where the court is charged with protecting the public interest. *Feist* reiterated a time-honored principle which courts too often ignore: "The primary objective of copyright is not to reward the labor or authors, but '[t]o promote the Progress of Science and useful Arts.'" —— U.S. ——, 111 S.Ct. at 1290 (quoting Art. I, § 8, cl. 8). *See also Mazer v. Stein*, 347 U.S. 201, 219, 74 S.Ct. 460, 471, 98 L.Ed. 630 (1954) ("'The copyright law, like the patent statutes, makes reward to the owner a secondary consideration.'") (quoting *United States v. Paramount Pictures*, 334 U.S. 131, 158, 68 S.Ct. 915, 929, 92 L.Ed. 1260 (1948)); *Fox Film Corp. v. Doyal*, 286 U.S. 123, 127, 52 S.Ct. 546, 547, 76 L.Ed. 1010 (1932) ("The 'sole' interest of the United States and the primary object in conferring the [copyright] monopoly lie in the general benefits derived by the public from the labors of authors.") (repeated in *Sony Corp. v. Universal City Studios*, 464 U.S. 417, 429, 104 S.Ct. 774, 782, 78 L.Ed.2d 574 (1984); *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156, 95 S.Ct. 2040, 2044, 45 L.Ed.2d 84 (1975)).

ers is that a copy, the "fixation," be made simultaneously with the initial transmission of the work. 17 U.S.C. §§ 102(a) and 101 (definition of "fixed"); *see* footnote 2, *supra.* Conceivably, the broadcaster could erase the tape on which a transmission program was recorded within a matter of minutes, hours or days,[19] thereby denying access to the copyrighted, unpublished work to any member of the public. Under the observation made in footnote 17 of *WXIA I* and advocated by CNN here, such a broadcaster could enforce an infringement remedy of all-inclusive dimension and duration for a work that no longer existed. Under such a scenario, there would be nothing in the way of a deposit for a district court or appellate court to scrutinize. The potential for abuse is manifest in such a situation where "the means of dissemination of ideas are increasingly concentrated in fewer hands." *Forward* at viii. By approving a grant of injunctive relief for infringement of unregistered, copyrighted transmission programs, we would allow broadcasters to close the door on public access to their work product. In a society where the free flow of and access to ideas is mandated by the First Amendment, it would be particularly pernicious to allow the news media, cloaked in the privileges of the First Amendment, to thwart such access and to control such flow under the title of a copyright owner. Manifestly, when courts grant broad and sweeping injunctive relief, such as that afforded in the instant case, dangerous precedents and fundamental problems are created. Particularly in an age when the broadcast media represent the source of news for so many

citizens, thoughtful consideration must be afforded to the public interest.

The doctrine of "fair use" was codified for the first time in the 1976 Copyright Act ("the Act"). Its codification reflected the concern of the Congress that the interest of the public be protected; that access to the source of all ideas, the public domain, remain unrestricted. Since the Act no longer required publication,[20] which historically ensured the right of access, as a condition for statutory copyright, Congress added the "fair use" provisions found at 17 U.S.C. § 107.[21] This supplemented the admonition under 17 U.S.C. § 102(b) that: "In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work." Moreover, the emergence of the doctrine that free speech encompasses the right to have access to, as well as the right to disseminate ideas underscores the need for courts to exercise great care when fashioning injunctive relief in the copyright arena. "[Copyright] protection has never accorded the copyright owner complete control over all possible uses of his work." *Sony Corp. v. Universal City Studios,* 464 U.S. 417, 432, 104 S.Ct. 774, 784, 78 L.Ed.2d 574 (1984).

In the case at bar, *had* CNN undertaken registration of its claim of copyright in a typical broadcast day, the scope of injunctive relief afforded by the district court would remain overbroad. CNN's putative copyright would be in the nature of a com-

---

**19.** *See Pacific & Southern Co. v. Duncan,* 572 F.Supp. 1186, 1191 (N.D.Ga.1983) ("As is its custom, WXIA kept that videotape for a period of one week, after which it was destroyed."), *rev'd,* 744 F.2d 1490, 1493 ("The station erases the videotape of the entire program after seven days, a practice that destroys any record of the visual element of segments of the show broadcast live from within the studio.").

**20.** The mere broadcast of a transmission program does not constitute publication. *See* Definition of "publication" at 17 U.S.C. § 101 ("A public performance or display of a work does not itself constitute publication."); footnote 1, *supra,* as to "display" and "perform."

**21.** As emphasized in the House Report discussing the fair use provisions of the Act:

Although the courts have considered and ruled upon the fair use doctrine over and over again, no real definition of the concept has ever emerged. Indeed, since the doctrine is an equitable rule of reason, *no generally applicable definition is possible,* and each case raising the question must be decided on its own facts.

H.R.Rep. No. 1476, 94th Cong., 2d Sess. 65, *reprinted in* 1976 U.S.Code Cong. & Admin. News 5659, 5679 (emphasis added).

pilation which would include many segments, usually prerecorded, as to which it would have no claim of copyright. Relative to those segments, rights of fair use would exist in the public, including VMS. Thus, any injunctive relief which precludes copying of such a compilation "in whole or in part," R1-17-1 (the language of CNN's motion approved by the district court), would impermissibly preclude copying works or information as to which CNN's compilation copyright would not attach. It should be reemphasized that "[a]ll reproductions of the [copyrighted] work, however, are not within the exclusive domain of the copyright owner; some are in the public domain. Any individual may reproduce a copyrighted work for a 'fair use'; the copyright owner does not possess the exclusive right to such a use." *Id.* at 433, 104 S.Ct. at 784.

■ In *WXIA I*, this court recognized that a television news broadcast is a compilation:

> A [news] program consists of self-contained news stories originating outside the studio and linked together by live commentary from the anchor persons, along with weather reports and short news reports originating from the studio itself."

*WXIA I*, 744 F.2d at 1493. Accordingly, a typical television newscast may be copyrightable in its entirety as a compilation only.[22] The various news stories, prerecorded segments, interviews, and weather reports presented in newscasts clearly constitute preexisting, collected and assembled materials that are factual in nature. It is the selection, coordination, and arrangement of these materials that may make the newscast as a whole an original work of

collective authorship copyrightable only as a compilation.[23] Therefore, the teachings of *Feist* as to the scope of copyright protection for compilations govern this case to the extent that the district court sought to afford protection to such newscasts. Justice O'Connor, in *Feist*, reiterated the importance of originality as the *sine qua non* of copyright protection and specifically addressed "the news of the day," stating:

> The originality requirement ... remains the touchstone of copyright protection today.... It is the very "premise of copyright law." *Miller v. Universal City Studios, Inc.*, 650 F.2d 1365, 1368 (CA 5 1981). Leading scholars agree on this point. As one pair of commentators succinctly puts it: "The originality requirement is *constitutionally mandated* for all works." Patterson & Joyce, *Monopolizing the Law: The Scope of Copyright Protection for Law Reports and Statutory Compilations*, 36 UCLA L.Rev. 719, 763, n. 155 (1989) (emphasis in original) ....

> \* \* \* \* \* \*

> It is this bedrock principle of copyright that mandates the law's seemingly disparate treatment of facts and factual compilations.... This is because facts do not owe their origin to an act of authorship. The distinction is one between creation and discovery: *the first person to find and report a particular fact has not created the fact;* he or she has merely discovered its existence.... Census data therefore do not trigger copyright because these data are not "original" in the constitutional sense.... The same is true of all facts—scientific, historical, biographical, and *the news of the day.*" "[T]hey *may not be copyrighted and are a part of the public*

---

**22.** As noted in 17 U.S.C. § 101 "[a] 'collective work' is a work ... in which a number of contributions, constituting separate and independent works in themselves, are assembled into a collective work," and "[a] 'compilation' is a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship. The term 'compilation' includes collective works."

**23.** After *Feist* it cannot be assumed that every newscast would qualify for even compilation copyright status. Indeed, *Feist* places such a conclusion in serious doubt. *See also, Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 59, 4 S.Ct. 279, 282, 28 L.Ed. 349 (1884); *Time, Inc. v. Bernard Geis Associates*, 293 F.Supp. 130, 141 (S.D.N.Y.1968).

*domain* available to every person." *Miller, supra,* at 1369.

*Feist,* —— U.S. at ——, 111 S.Ct. at 1288–89 (emphasis added) (citations omitted). *Feist,* therefore, reasserts the fundamental copyright principle that a copyright in a compilation cannot be used to protect uncopyrightable or uncopyrighted material existing as part of the compilation. Admonishing that "the copyright in a factual compilation is thin," the Court reminds us that "if the selection and arrangement are original, these elements of the work are eligible for copyright protection.... No matter how original the format, however, the facts themselves do not become original through association." *Id.* at ——, 111 S.Ct. at 1289. This is consistent with 17 U.S.C. § 103(b) which provides:

> The copyright in a compilation ... extends only to the material contributed by the author of such work, as distinguished from the pre-existing material employed in the work, and does not imply any exclusive right in the pre-existing material. The copyright in such work is independent of, and does not affect or enlarge the scope, duration, ownership, or subsistence of, any copyright protection in the pre-existing material.

Simply stated, the copyright in a compilation does not prohibit the copying of pre-existing material that is in the compilation. In this case, therefore, any injunction that would prevent the copying of CNN's newscasts "in any part" would be inconsistent with the Copyright Act, particularly its fair use provisions, and both the Copyright Clause and the First Amendment to the Constitution.[24] As a result, we conclude that the district court erred in concluding that CNN had a substantial likelihood of success on the merits and that the relief afforded served the public interest.

Because the district court misapplied the law, as discussed above, we REVERSE the grant of the preliminary injunction and REMAND this case to the district court for further proceedings consistent with this opinion.

REVERSED and REMANDED.

---

24. In a recent decision a federal district court in Utah was presented with a claim of copyright and putative registration embracing over 90,000 pages of litigation documents by a drug manufacturer in a high profile product liability case. The drug manufacturer sought to use its status as a copyright owner to censor the information contained in the documents. The manufacturer was particularly sensitive to the media's access to the documents. The district court, in a well reasoned decision, invalidated the certificate of registration asserting: "They are invalid because they fail to specify which of the documents are copyrightable to Upjohn, and provide no index on other workable means to separate and identify the documents in question from other documents in the registration which Upjohn concedes are not copyrightable." That court also observed: "It is important that the registration requirements be followed because the certificate describes what material is registered. Description of the copyrighted material in the application and copyright certificate is required in order to put the public on notice of what material is protected under the copyright laws." *Grundberg v. The Upjohn Co.,* 137 F.R.D. 372, 384, 385 (D.Utah 1991).

## APPENDIX A

1050 TECHWOOD DRIVE, N.W. / ATLANTA, GEORGIA 30318 / (404) 827-1700
(404) 827-1713

Benita S Baird
Assistant General Counsel

March 12, 1985

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Mr. Robert Cohen, President
Video Monitoring Service
330 West 42nd Street
New York, New York 10036

Re: Licensing of Cable News Network ("CNN") footage

Dear Mr. Cohen:

It appears from our telephone conversation of last week that your company, Video Monitoring Service, is in the for profit business of, among other things, licensing CNN footage.

As you are aware, CNN programming is copyrighted and we have valuable rights in the programming which are protected by federal law. Such rights include the exclusive right to distribute copies of CNN programming to the public. Cable News Network, Inc., the owner of the copyright to CNN programming, has never at any time granted you a license to license the use of CNN programming to others. The taping of CNN programming by your company and the subsequent licensing of the footage to third parties for a fee violates the Copyright Act of 1976, as amended; in connection with such violations, civil liability in the form of monetary damages or equitable relief and criminal liability could be impos'ed. As you and I discussed last week, on October 26, 1984, the United States Court of Appeals for the Eleventh Circuit held against a monitoring and news clipping organization for videotaping a news broadcast and selling the same.

EXHIBIT "  "

1488

Mr. Robert Cohen
March 12, 1985
Page Two

        This letter is to confirm our telephone conversation and put
you on notice that any taping and licensing of the use of CNN
material by your company is absolutely unauthorized and in the
event you do not cease and desist from engaging in such unlawful
activities immediately with respect to the videotaping and
licensing of CNN material, we will be compelled to pursue all
legal remedies available to us.

                              Sincerely yours,

                              Benita S. Baird
                              Assistant General Counsel

BSB:bs

## APPENDIX B

**CERTIFICATE OF COPYRIGHT REGISTRATION**

**FORM PA**
UNITED STATES COPYRIGHT OFFICE

This certificate, issued under the seal of the Copyright Office in accordance with the provisions of section 410(a) of title 17, United States Code, attests that copyright registration has been made for the work identified below. The information in this certificate has been made a part of the Copyright Office records.

*[signature]*

**REGISTER OF COPYRIGHTS**
United States of America

**OFFICIAL SEAL**

**REGISTRATION NUMBER**

PAu 1 136 813

PA    PAU

**EFFECTIVE DATE OF REGISTRATION**

OCT. 17 1988
Month    Day    Year

---

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**1**

**TITLE OF THIS WORK ▼**

Crossfire

**PREVIOUS OR ALTERNATIVE TITLES ▼**

Barry Goldwater: Mr. Conservative

**NATURE OF THIS WORK ▼** See instructions

motion picture

**2**

**a**

**NAME OF AUTHOR ▼**

Cable News Network, Inc.

**DATES OF BIRTH AND DEATH**
Year Born ▼    Year Died ▼

Was this contribution to the work a "work made for hire"?
☒ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR { Citizen of ▶ U.S.A.
{ Domiciled in ▶ _____

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous? ☐ Yes ☒ No
Pseudonymous? ☐ Yes ☒ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NOTE**
Under the law, the "author" of a "work made for hire"...

**NATURE OF AUTHORSHIP** Briefly describe nature of the material created by this author in which copyright is claimed. ▼

entire work

**b**

**NAME OF AUTHOR ▼**

**DATES OF BIRTH AND DEATH**
Year Born ▼    Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of country
OR { Citizen of ▶ _____
{ Domiciled in ▶ _____

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous? ☐ Yes ☐ No
Pseudonymous? ☐ Yes ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Briefly describe nature of the material created by this author in which copyright is claimed. ▼

**c**

**NAME OF AUTHOR ▼**

**DATES OF BIRTH AND DEATH**
Year Born ▼    Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of country
OR { Citizen of ▶ _____
{ Domiciled in ▶ _____

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous? ☐ Yes ☐ No
Pseudonymous? ☐ Yes ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Briefly describe nature of the material created by this author in which copyright is claimed. ▼

**3**

**YEAR IN WHICH CREATION OF THIS WORK WAS COMPLETED** This information must be given in all cases.

1988 ◀ Year

**DATE AND NATION OF FIRST PUBLICATION OF THIS PARTICULAR WORK** Complete this information ONLY if this work has been published.

Month ▶ _____ Day ▶ _____ Year ▶ _____ ◀ Nation

**4**

**COPYRIGHT CLAIMANT(S)** Name and address must be given even if the claimant is the same as the author given in space 2. ▼

Cable News Network, Inc.
One CNN Center, Box 105366
Atlanta, Georgia 30348-5366

**TRANSFER** If the claimant(s) named here in space 4 are different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright. ▼

**APPLICATION RECEIVED** OCT. 17 1988
**ONE DEPOSIT RECEIVED** OCT. 17 1988
**TWO DEPOSITS RECEIVED**
**REMITTANCE NUMBER AND DATE**

---

**MORE ON BACK ▶** • Complete all applicable spaces (numbers 5-9) on the reverse side of this page. • See detailed instructions. • Sign the form at line 8.

EXHIBIT "A"

DO NOT WRITE HERE
Page 1 of _____ pages.

1490

■■■■■■■■■

■■■■■■■■■

CHECKED BY _____ e 8

☐ CORRESPONDENCE
   Yes

☐ DEPOSIT ACCOUNT
   FUNDS USED

FOR
COPYRIGHT
OFFICE
USE
ONLY

PAu 1 136 813

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**PREVIOUS REGISTRATION** Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?
☐ Yes ☒ No  If your answer is "Yes," why is another registration being sought? (Check appropriate box) ▼
☐ This is the first published edition of a work previously registered in unpublished form.
☐ This is the first application submitted by this author as copyright claimant.
☐ This is a changed version of the work, as shown by space 6 on this application.
If your answer is "Yes," give: Previous Registration Number ▼        Year of Registration ▼

**5**

**DERIVATIVE WORK OR COMPILATION** Complete both space 6a & 6b for a derivative work; complete only 6b for a compilation.
a. Preexisting Material  Identify any preexisting work or works that this work is based on or incorporates. ▼

b. Material Added to This Work  Give a brief, general statement of the material that has been added to this work and in which copyright is claimed. ▼

**6**

See instructions
before completing
this space.

**DEPOSIT ACCOUNT** If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.
Name ▼                                    Account Number ▼

**7**

**CORRESPONDENCE** Give name and address to which correspondence about this application should be sent.  Name/Address/Apt/City/State/Zip ▼
Benita S. Baird, Esq., Assistant General Counsel
Turner Broadcasting System, Inc.
One CNN Center, Box 105366
Atlanta, Georgia  30348-5366
Area Code & Telephone Number ▶ (404) 827-1713

Be sure to
give your
daytime phone
number

**CERTIFICATION\*** I, the undersigned, hereby certify that I am the
check only one ▼
☐ author
☐ other copyright claimant
☐ owner of exclusive right(s)
☒ authorized agent of    Cable News Network, Inc.
                         Name of author or other copyright claimant, or owner of exclusive right(s) ▲

**8**

of the work identified in this application and that the statements made
by me in this application are correct to the best of my knowledge.

Typed or printed name and date ▼ If this is a published work, this date must be the same as or later than the date of publication given in space 3.

Steven W. Korn, Vice President        date ▶ October 17, 1988

Handwritten signature (X) ▼ _____

**MAIL
CERTIFI-
CATE TO**

Name ▼
Benita S. Baird, Esq., Assistant Gen. Counsel
Number/Street/Apartment Number ▼
One CNN Center
City/State/ZIP ▼
Atlanta, Georgia  30348-5366

Have you:
• Completed all necessary spaces?
• Signed your application in space 8?
• Enclosed check or money order for $10 payable to Register of Copyrights?
• Enclosed your deposit material with the application and fee?

MAIL TO: Register of Copyrights, Library of Congress, Washington, D.C. 20559

**9**

17 U.S.C. § 506(e): Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.

GOVERNMENT PRINTING OFFICE: 1987-181-891/60,029

July 1987-150,000

■■■■■■■■■