**PACIFIC AND SOUTHERN COMPANY, INC., d/b/a WXIA–TV**

v.

**Carol DUNCAN, d/b/a TV News Clips.**

**Civ. No. C81–1106.**

United States District Court,
N.D. Georgia,
Atlanta Division.

Oct. 13, 1983.

James C. Rawls, V. Robert Denham, Jr., Powell, Goldstein, Frazer & Murphy, Atlanta, Ga., for plaintiff.

Lynwood A. Maddox, Decatur, Ga., L. Ray Patterson, Emory School of Law, Atlanta, Ga., for defendant.

## ORDER

ORINDA D. EVANS, Chief Judge.

This copyright infringement action is before the Court for findings of fact and conclusions of law following a bench trial.

This case presents the question whether off the air video taping of live television news broadcasts by a TV news monitoring service, followed by the marketing and sale of news tapes to interested members of the public, infringes the broadcaster's copyright under federal law. 17 U.S.C. § 101 et seq. The Defendant, a television news "clipping service," argues that its activities constitute a permissible fair use under the copyright statute, 17 U.S.C. § 107, or alternatively, that the First Amendment to the United States Constitution prohibits interference with its activities notwithstanding an otherwise valid copyright.

After due consideration of the evidence and arguments of counsel, the Court hereby finds and concludes as follows:

## I. FINDINGS OF FACT

Plaintiff WXIA–TV is a television station in Atlanta, Georgia. It is duly licensed by the Federal Communications Commission to operate as Channel 11. It broadcasts a 90-minute news program every evening at 5:30 p.m. A notice of copyright appears at the end of each newscast.

TV News Clips ("News Clips") is the name under which Ms. Carol Duncan conducts a for-profit television news monitoring and clipping service.[1] News Clips videotapes Channel 11's news programs and the news programs of other stations. It contacts each person or company who is the subject of a newscast segment to see if they would like to purchase a copy. Customers pay $65 for an initial news clip purchase and $25 for subsequent purchases. The videotaping and sales of copies occur without WXIA's permission. Copies contain no notice of copyright, but the tape cassettes are labelled "For personal use only not for rebroadcast." News Clips informs purchasers that it is not affiliated with WXIA.

News Clips erases its tapes one month after the pertinent broadcast.

The instant litigation began with WXIA's discovery that News Clips had sold a tape of a feature from its March 11, 1981 evening newscast to Floyd Junior College in Rome, Georgia. The feature was a one minute, 45 second segment concerning a newly installed "fitness trail" at the junior college. The segment showed individuals jogging on the trail (at least one of whom was a WXIA employee) and depicted various athletic equipment along the way. An on-the-scene reporter made salutary comments about the trail and the health benefits to be derived from using it.

After effecting the copyright registration which is a prerequisite to bringing a copyright infringement action, WXIA instituted the within suit. WXIA seeks damages for the infringement of its copyright on the fitness trail feature. In addition, it seeks an injunction against News Clips to stop future unauthorized copying or sales of cop-

---

1. The business was originally a one-person operation run out of Ms. Duncan's home; however, it has flourished and is now a full-fledged commercial operation.

News Clips is a member of the International Association of Broadcast Monitors, an organization with from 20 to 30 members who provide news "clipping" and related services. News Clips' owner, Carolyn Duncan, is a past president of the association. Duncan provided evidence that another monitoring service, Videomonitoring Services of America, Inc., includes among its clients the Brooklyn Union Gas Co., Fairfield University, the Institute for Behavioral Research, Legal Services Corp., National Association of Manufacturers, the New York Stock Exchange and the United States Chamber of Commerce.

ies of its news programs, plus recovery of the costs of this action, including attorneys' fees.

As one would expect, WXIA's news programs are made up of a variety of elements. Some are pretaped; some are live. These elements include, *inter alia,* on-the-spot coverage of primary news events, *e.g.,* a speech by a public official; "on-the-scene" comments by news reporters; news desk reports on the events of the day; feature stories such as the fitness trail sequence; weather reports; editorials; and miscellaneous commentary by the anchor persons at the news desk.

WXIA has made no effort to develop a market for sales of copies of its news casts or portions thereof. It receives infrequent requests for copies; however, when such requests are received they are accommodated as a public service. The charge is $100 a copy. However, from time to time requests are made under circumstances which cause the station to impose additional requirements and/or refuse the requests. The evidence showed at least one occasion in which the station required a subpoena to be obtained where the news segment was going to be used in litigation. Also, the station will not provide newscast copies to political candidates. This is because of a concern that the copy might be used inappropriately to suggest involvement of the station in a campaign.

No one from Floyd Junior College appeared at trial to testify as to its motive in purchasing the fitness trail sequence. However, testimony concerning the perceived reason for purchases of the film clips generally was given at trial by Ms. Duncan, News Clips' owner. She believes the majority of her customers purchase clips to study and thereby improve the image they are projecting to the public. She pointed out that she has a number of repeat customers who regularly appear in the news. These include a large public utility, high-level state and federal officials, a teachers' lobbying group, and a corporation which regularly contracts with the Department of De-

fense. Similar testimony was given by a professional associate of Ms. Duncan's who conducts a news taping business in Canada. The Canadian company has contracts with the Canadian government, including specifically, a contract with Canada's Nuclear Energy Commission.

News Clips also sells clips to lawyers involved in litigation to which a news story may be relevant. Ms. Duncan conceded that a certain percentage of her customers—she thought between five and ten percent—are individuals who simply wish to purchase a story as a souvenir.

WXIA, on the other hand, asserts that the evidence does not establish with sufficient certainty why News Clips' clients purchase the clips or what they are doing with them. The Court thinks it reasonable to infer—and does infer—that some of News Clips' clients—for example, the repeat customers specifically mentioned—do purchase the clips in order to analyze and improve self image. However, the Court rejects as speculative the estimates of what percentage of Ms. Duncan's clients purchase news clips for the purpose of self study.

## II. DISCUSSION

### A. *Preliminary Issues*

Before turning to the substantive issues presented, there are unresolved preliminary issues concerning: (1) whether Plaintiff's March 11, 1981 newscast was "fixed" so as to be subject to copyright and (2) whether Plaintiff properly registered its claim of copyright so as to satisfy the statutory prerequisite for bringing suit. In order to rule on these issues, the Court must make certain further findings of fact. They are:

The fitness trail feature was pretaped.[2] During the March 11 broadcast, there was a live introduction of the feature by the anchor person; also, superimposed graphics were added stating the on-the-scene reporter's name and the location. While the program was being aired, a videotape of the finished product was made from a television

2. This tape has both visual and audio aspects.

set in the studio. As is its custom, WXIA kept that videotape for a period of one week, after which it was destroyed. However, also in accordance with its customary practice, WXIA will retain the pretaped fitness trail feature for five to seven years. WXIA retains written scripts of its live broadcasts for a period of one year, and audio tapes of each broadcast for an indefinite period. Thus, WXIA still has a script of the anchor introduction to the fitness trail sequence, the pretaped fitness trail feature, and the audiotape of the entire March 11, 1981 program.

On May 13, 1981, WXIA deposited with the Register of Copyrights an audio tape and transcript of the entire March 11, 1981 broadcast, as well as the pretaped fitness trail feature. On July 24, 1981, WXIA's counsel further deposited a description of the entire March 11 news program. WXIA received a certificate of copyright for the fitness trail segment on May 18, 1981, and a certificate for the entire broadcast on November 3, 1981.

■ It is a fundamental requirement for copyright protection that a work be "fixed in any tangible medium of expression." 17 U.S.C. § 102.

> A work is "fixed" in a tangible medium of expression when its embodiment in a copy or phonorecord, by or under the authority of the author, is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration. A work consisting of sounds, images, or both, that are being transmitted, is "fixed" for purposes of this title if a fixation of the work is being made simultaneously with its transmission.

17 U.S.C. § 101.

■ The fitness trail sequence was fixed when it was pretaped. The March 11 program as a whole was fixed at the time it was aired and the studio videotape was made.

■ Except in certain cases not relevant here, no copyright infringement action may be brought until the claim of copyright is registered with the Register of Copyrights in Washington, D.C. 17 U.S.C. § 411(a). Proper registration is a necessary condition precedent to filing suit.[3] A copyright owner may obtain registration of a claim by delivering to the Copyright Office an application, the specified fee, and an appropriate deposit of the work. 17 U.S.C. § 408(a). The deposit requirements are set forth generally in 17 U.S.C. § 408(b) and vary according to the nature of the work. As is discussed more fully below, the fitness trail feature is an "unpublished work"; hence, 17 U.S.C. § 408(b)(1) required that the deposit consist of "one complete copy or phonorecord." Additionally, special regulations applicable to a "transmission program," e.g., a television program, also permitted registration of the March 11 broadcast as a whole by depositing an audiotape of the entire broadcast and a description of the program. 17 U.S.C. § 408(c); 37 C.F.R. § 202.21(g). The Court finds that WXIA's deposit of the pretaped version of the fitness trail feature on May 13, 1981 constituted a proper deposit under the provisions of 17 U.S.C. § 408(b)(1) and established copyright registration for the fitness trail feature. Additionally, WXIA's deposit of the audiotape and description of the entire March 11, 1981 broadcast sufficed to satisfy the alternative requirement for a deposit of a transmission program. Thus, WXIA's claim of copyright in the news cast as a whole was properly registered.

### B. Copyright and Television News: The Scope of Statutory Protection

■ It is axiomatic that copyright protection does not extend to news "events" or the facts or ideas which are the subject of news reports. *Miller v. Universal City Studios, Inc.,* 650 F.2d 1365, 1368 (5th Cir.1981); *Wainwright Securities, Inc. v. Wall Street*

---

**3.** A certificate of registration does not determine the validity of the claim, but merely constitutes prima facie evidence. *Durham Indus-*

*tries, Inc. v. Tomy Corp.,* 630 F.2d 905, 908 (2d Cir.1980); *Moore v. Lighthouse Publishing Co., Inc.,* 429 F.Supp. 1304, 1308 (S.D.Ga.1977).

*Transcript Corp.,* 558 F.2d 91, 95 (2d Cir. 1977), *cert. denied,* 434 U.S. 1014, 98 S.Ct. 730, 54 L.Ed.2d 759 (1978). But it is equally well-settled that copyright protection does extend to the reports themselves, as distinguished from the substance of the information contained in the reports. *Wainwright,* 558 F.2d at 95; *International News Service v. Associated Press,* 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918); *see Chicago Record-Herald Co. v. Tribune Assn.,* 275 F. 797 (7th Cir.1921); 1 Nimmer on Copyright § 2.11[B] (1983). Copyright protects the manner of expression of news reports, "the particular form or collocation of words in which the writer has communicated it." *International News Service,* 248 U.S. at 234, 39 S.Ct. at 70. Such protection extends to electronic news reports as well as written reports. *See* 17 U.S.C. § 102(a)(5), (6), and (7); *see also Iowa State University Research Foundations, Inc. v. American Broadcasting Cos.,* 621 F.2d 57, 61 (2d Cir. 1980).

In the instant case, Ms. Duncan's copying of the fitness trail feature was not a mere attempt to relate the substance of the information contained in the feature. Rather, it was a total reproduction embodying both the facts which were the subject of the feature, and the particular way in which those facts were presented. Therefore, WXIA is entitled to a judgment in its favor unless one of Ms. Duncan's defenses is meritorious. The Court now turns to an examination of each of these defenses.

## C. *First Amendment*

■ Defendant argues that an unlimited copyright in television news violates the First Amendment.[4] She points to the public's interest in the fullest possible dissemination of news, and the unique ephemeral nature of television news broadcasts. She further asserts that a television station might elect either not to preserve its broadcast material in permanent form, or not to make broadcast copies readily available to members of the public. In such a case, she argues, prohibiting copying might be tantamount to sanctioning monopolization of information.

Courts and commentators have for years recognized a possible tension between copyright and first amendment freedom of speech. *See Triangle Publications, Inc. v. Knight-Ridder Newspapers,* 626 F.2d 1171 & n. 1 (5th Cir.1980) (and cases cited therein); Nimmer, Does Copyright Abridge the First Amendment Guarantees of Free Speech and Press? 17 U.C.L.A.L.Rev. 1180 (1970); Patterson, Private Copyright and Public Communication: Free Speech Endangered, 28 Vand.L.Rev. 1161 (1975). Generally, however, "[c]onflicts between interests protected by the first amendment and the copyright laws thus far have been resolved by application of the fair use doctrine." *Wainwright Securities,* 558 F.2d at 95. Other courts have found that the copyright dichotomy between ideas and facts, which are not protected, and the form of expression, which is, is sufficient in nearly all cases to accommodate the relevant constitutional values. *See, e.g., Roy Export Co. Establishment of Vaduz, Liechtenstein v. Columbia Broadcasting System, Inc.,* 672 F.2d 1095, 1099–1100 (2d Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982). In the words of Professor Nimmer:

> On the whole ... it appears that the idea-expression line represents an acceptable definitional balance as between copyright and free speech interests. In some degree it encroaches upon freedom of speech in that it abridges the right to reproduce the "expression" of others, but this is justified by the greater public good in the copyright encouragement of creative works. In some degree it encroaches upon the author's right to control his works in that it renders his "ideas" per se unprotectible, but this is justified by the greater public need for free access to ideas as a part of the democratic dialogue.

---

**4.** She suggests the copyright should be enforceable only against infringement by a competing broadcaster.

1 Nimmer on Copyright § 1.10[B] (1983), at 1–76–1–77 (footnotes omitted).

No circuit has recognized a First Amendment exception to copyright apart from the doctrine of fair use. *See Roy Export,* 672 F.2d at 1099–1100; *Iowa State University Research Foundation,* 621 F.2d at 61 n. 6; *Triangle Publications,* 626 F.2d at 1172; *Dallas Cowboys Cheerleaders, Inc. v. Scoreboard Posters, Inc.,* 600 F.2d 1184, 1188 (5th Cir.1979); *Walt Disney Productions v. Air Pirates,* 581 F.2d 751, 758–59 (9th Cir.1978), *cert. denied,* 439 U.S. 1132, 99 S.Ct. 1054, 59 L.Ed.2d 94 (1979); *Wainwright Securities,* 558 F.2d at 95. Some courts in dicta have, however, noted Professor Nimmer's view that for some works the "idea" and the expression of that idea may be so inseparable, and the work may be so infused with public interest, that both should be in the public domain and exempt from copyright. *Roy Export,* 672 F.2d at 1099–1100; *Iowa State University Research Foundation,* 621 F.2d at 61 n. 6; *Wainwright Securities,* 558 F.2d at 95. Professor Nimmer gives as examples Vietnam War photographs of the My Lai massacre or the Zapruder "home movie" of the Kennedy assassination.[5] 1 Nimmer on Copyright § 1.10[C] (1983), at 1–82–1–83. He suggests that the First Amendment protects a category of works that contribute to the "democratic dialogue," a category which he labels "news photographs." *Id.* at 1–84.

> Photographs would refer to all products of the photographic and analogous processes, including motion picture film and videotape, but would exclude other graphic works, such as paintings, sculpture, etc. . . . . There is a definitional problem as to when a photograph is a *news* photograph. . . . Perhaps a pragmatic definition would prove useful: *e.g.,* a photograph is a news photograph only if the event depicted in the photograph, as distinguished from the fact that the photograph was made, is the subject of

news stories appearing in newspapers throughout the country.

*Id.*

While the Court finds Defendant's argument theoretically provocative, it has little applicability to the question of whether copying the fitness trail feature infringed Plaintiff's copyright. The fitness trail feature is a "soft news" piece which, though informational, hardly fits in a category with film of the My Lai massacre. Moreover, Plaintiff has preserved the original film; a copy is available to anyone who wants one. Indeed, the fitness trail itself is available for viewing. Thus, the First Amendment offers no defense to Ms. Duncan.

### D. *Fair Use*

■ Defendant argues that her copying of the fitness trail feature constituted a permissible "fair use" under 17 U.S.C. § 107. For the reasons hereinafter set forth, the Court rejects her argument.

Fair use has been defined in a much-quoted passage as "a privilege in others than the owner of a copyright to use the copyrighted material in a reasonable manner without his consent, notwithstanding the monopoly granted to the owner [by the copyright]." *Rosemont Enterprises, Inc. v. Random House, Inc.,* 366 F.2d 303, 306 (2d Cir.1966), *cert. denied,* 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967), *quoting* Ball, The Law of Copyright and Literary Property 260 (1944). The doctrine has been described as "the most troublesome in the whole law of copyright." *Dellar v. Samuel Goldwyn, Inc.,* 104 F.2d 661, 662 (2d Cir.1939). It was codified for the first time in the Copyright Act of 1976, but in codifying the doctrine Congress did not seek to preclude further judicial development depending on the facts of each case. H.R.Rep. No. 94–1476, 94th Cong., 2d Sess. 66, *reprinted in* 1976 U.S. Code Cong. & Ad.News 5659, 5680.

Section 107 provides:

---

**5.** In *Time, Inc. v. Bernard Geis Associates,* 293 F.Supp. 130 (S.D.N.Y.1968), the court found the unauthorized use of the Zapruder film to be fair use. Professor Nimmer believes the case

more soundly rests on a First Amendment rationale. 1 Nimmer on Copyright § 1.10[D] (1983) at 1–86–1–87. This Court agrees.

Notwithstanding the provisions of section 106, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

Defendant argues that her copying and sale of the fitness trail feature is a fair use taking into account the four factors listed under § 107 in subsections (1)–(4). She concedes that her activity is commercial, but she asserts that factors (1) and (2) under § 107 favor fair use because the nature of the copyrighted work is news; also, the public interest favors the wider dissemination of news which she argues is facilitated by her distribution of news segments. Under factor (3), she argues that because the fitness trail feature is only a small portion of the March 11 broadcast, a finding of fair use is indicated. Finally, under factor (4) she contends that her sale of news clips in no way diminishes WXIA's news viewership; indeed, she points out correctly that the market for news clip segments has been created almost solely through her efforts.

In arguing that these four factors favor fair use, Defendant cites a binding decision of the Court of Appeals for the Fifth Circuit, *Triangle Publications, Inc. v. Knight-Ridder Newspapers, Inc.,* 626 F.2d 1171 (5th Cir.1980).[6] That case holds that commercial use does not preclude a finding of fair use; also, it holds that the fourth fair use factor, effect of the use upon the potential market for the copyrighted work, is by far the most important factor.

Ms. Duncan's fair use defense fails because she overlooks important limiting language in § 107; also, she misidentifies the use which is relevant to "fair use" analysis in this case.

17 U.S.C. § 107 does not automatically require any use which is sought to be labeled "fair" to be analyzed under the guidelines set forth in subparagraph (1) through (4). Rather, it is only where the use is clearly for "purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research," 17 U.S.C. § 107 (initial unnumbered paragraph), that the Court's interest in subfactors (1) through (4) is triggered. To interpret the statute otherwise would invite facile obliteration of copyright protection through the back door route of the fair use defense.

In determining whether or not Ms. Duncan's use of the news clips falls within a category similar to those set forth in § 107, the Court must first determine exactly what "use" is relevant here. Insofar as Ms. Duncan is concerned, the relevant "use" is simply her copying of the newscasts, and her subsequent sale of them. Whatever use her clients may make of these film clips is irrelevant.[7] Ms. Duncan is not being sued as a contributory infringer, *cf. Universal City Studios, Inc. v. Sony Corp. of America,* 659 F.2d 963 (9th Cir. 1981), *cert. granted,* 457 U.S. 1116, 102 S.Ct.

---

**6.** Cases decided by the Fifth Circuit Court of Appeals prior to October 1, 1981 are the law of the Eleventh Circuit. *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981).

**7.** The fair use defense would be considered from a different vantage point were the defend-

ant here a person who copied WXIA's newscasts for a personal use. As a matter of fact, however, this possibility is moot due to WXIA's stated indifference to such copying for private personal use.

2926, 73 L.Ed.2d 1328 (1982), but rather as the primary infringer. Furthermore, Ms. Duncan is a stranger to any use which might be made of the news clips by her clients. In that respect, she is different from a classroom teacher who might distribute copies of copyrighted material for classroom use. *See* 17 U.S.C. § 107.

■ Having made this initial determination, it becomes readily apparent that Ms. Duncan's use is not for a purpose such as "criticism, comment, news reporting, teaching, scholarship, or research." That being the case, analysis of the four factors listed under § 107 is unnecessary.

*Triangle Publications* is factually quite different from the instant case. For that reason, its holding does not assist Ms. Duncan. In *Triangle,* Plaintiff's magazine was pictured in a newspaper advertisement prepared by Defendant, a competitor, which published a similar magazine. The ad made a direct comparison between the two magazines, picturing their covers side-by-side. The text of the ad gave reasons why Plaintiff's publication was second best. Plaintiff contended that the display of its magazine cover infringed its copyright; Defendant claimed fair use. The Court of Appeals for the Fifth Circuit discussed each of the four fair use factors under § 107, and ruled for Defendant. As mentioned above, in so doing it rejected Plaintiff's claim that the commercial character of the use was conclusive against a finding of fair use; also, the

Court held that the fourth fair use factor was the most important, noting that use of the copyrighted material in the advertisement did not diminish the value of Plaintiff's copyright. *Triangle Publications,* 626 F.2d at 1177–78.

What is important for purposes of the instant case, however, is the fact that Defendant's "use" in *Triangle* fell within the language of § 107 limiting its applicability to "criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research." 17 U.S.C. § 107. Specifically, the advertisement was a classic form of "comment" on the copyrighted work. In this respect, Defendant's comparative advertisement was conceptually similar to satire or parody, *see Metro-Goldwyn-Mayer, Inc. v. Showcase Atlanta Cooperative Productions, Inc.,* 479 F.Supp. 351 (N.D.Ga.1979), which are recognized forms of fair use. The justification for these uses lies not in society's interest in wider distribution of the copyrighted material, but rather in its interest in the infringer's creative use of the copyrighted material. *See* L. Seltzer, Exemptions, and Fair Use in Copyright 23–27 (1977). Comparative advertisement, like satire, is a productive and creative use of the copyrighted material. Ms. Duncan's copying and distribution, on the other hand, was not an inherently productive or creative use of the type referred to in § 107.

Therefore, her fair use defense fails.[8]

---

**8.** Ms. Duncan clearly does not qualify for, and thus has not sought the protection of the television news archives exemption set forth in the 1976 Copyright Act. *See* 17 U.S.C. § 108(f). Section 108(f) provides an exemption from copyright infringement for the "reproduction and distribution by lending of a limited number of copies and excerpts by a library or archives of an audiovisual news program. . . ." This exemption applies where:

(1) the reproduction or distribution is made without any purpose of direct or indirect commercial advantage;

(2) the collections of the library or archives are (i) open to the public, or (ii) available not only to researchers affiliated with the library or archives or with the institution of which it is a part, but also to other persons doing research in a specialized field; and

(3) the reproduction or distribution of the work includes a notice of copyright.
17 U.S.C. § 108(a).

The statute does not define "audiovisual news program," but the legislative history states that it is intended to apply to the daily newscasts of local, regional and national television networks, interviews about current events, and on-the-spot coverage of news events. H.Conf.Rep. No. 1733, 94th Cong., 2d Sess. 73, *reprinted in* 1976 U.S.Code Cong. & Ad.News 5810, 5814. It does not apply to documentary or magazine-format public affairs programs. H.R.Rep. No. 1476, 94th Cong., 2d Sess. 77, *reprinted in,* 1976 U.S.Code Cong. & Ad.News 5659, 5690.

Section 108 itself states that nothing in the television news exemption "in any way affects the right of fair use as provided by section 107." 17 U.S.C. § 108(f)(4).

### E. *Remedy*

■ As previously stated, Plaintiff seeks injunctive relief, statutory damages, and an award of costs including attorneys' fees.

As a general rule, a plaintiff is entitled to a permanent injunction when copyright liability has been established and there is a threat of continuing infringement. *Universal City Studios v. Sony,* 659 F.2d at 976; 3 Nimmer on Copyright § 14.06[B] (1983), at 14–53–14–54. However, the Court may omit injunctive relief where it would disserve the public interest. *See Id.* § 13.-05[E][4][e], at 13–91–13–92.

With respect to any future sales of the fitness trail feature, injunctive relief is neither necessary nor appropriate. Defendant no longer has a copy of the feature; the circumstances do not suggest that she presently has access to Plaintiff's original. The real question is whether or not the Court should grant broad injunctive relief prohibiting Defendant from future copying of any of WXIA's newscasts. After consideration of the evidence presented, the Court declines to enter such an injunction.

The aim of copyright is to foster creativity. To this end, the statute gives the copyright holder the exclusive right to reproduce or distribute the work. *See* 17 U.S.C. § 106. In the instant case, however, Plaintiff destroys its broadcast videotapes a week after the broadcast. Thereafter, it retains only partial visual elements of the program. Since WXIA can only reproduce its news programs for a period of one week, but has never done so, it must be concluded that the post-broadcast market is relatively unimportant to it as a creative incentive. Hence, copyright objectives would be insubstantially served by broadly enjoining Defendant's sales of copies of Plaintiff's broadcasts.

At the same time, the Court must consider whether broad injunctive relief would infringe upon First Amendment rights. While the various elements of Plaintiff's broadcasts vary in informational importance, *see* p. 3, *supra,* all material WXIA carries on its broadcasts is presumptively newsworthy and therefore infused with a high degree of public interest. Further, the Supreme Court has recognized that the broadcast media present "an unusual order of First Amendment values" due to the inherent difficulty in allocating a scarce number of broadcast frequencies among applicants. *Columbia Broadcasting System v. Democratic National Committee,* 412 U.S. 94, 101, 93 S.Ct. 2080, 2086, 36 L.Ed.2d 772 (1973). Under the Communications Act of 1934, 47 U.S.C. § 151 *et seq.,* broadcasters are licensed by the federal government as public trustees and as such are required to serve the public interest. Under these circumstances, caution in fashioning a remedy is indicated and broad injunctive relief will not be granted unless Plaintiff's entitlement to and need for such relief is clear and convincing.

The Court concludes that Ms. Duncan's sale of newscast copies does not substantially further public dissemination or perpetuation of news accounts. Since she destroys her tapes within a month of the broadcast, the only archival purpose served by her activity is that attendant to getting news clips into private hands (actually, mostly into corporate file folders). However, the fact remains that under Plaintiff's present procedure, film of news events of possibly great import could be destroyed a week after the broadcast, with no useful copy being available thereafter. In such a case, Defendant's systematic copying and sales could represent a modest social benefit.

■ The Court concludes, moreover, that broad injunctive relief would improperly prohibit distribution of parts of newscasts where Plaintiff no longer has any copyright protection. Where a copyright holder evidences an intention to abandon his copyright by an overt act of abandonment, protection ceases. 3 Nimmer on Copyright § 13.06 (1983). WXIA's destruction of its broadcast videotapes is certainly such an overt act. And while it may be that large parts of the broadcast can still be pieced together from taped, audio and script components, and some pretaped portions may be entitled to independent copy-

right protection, the precise wording of an appropriately limited decree is unapparent.

■ In summary, given the referenced First Amendment considerations, plus Plaintiff's lack of a clearly demonstrated entitlement to or need for broad injunctive relief, the request for such relief will be denied.

Plaintiff seeks statutory damages in lieu of actual damages. Section 504 of the Copyright Act provides that a plaintiff may elect between "actual damages and any additional profits of the infringer," 17 U.S.C. § 504(a)(1), or statutory damages "in a sum of not less than $250 or more than $10,000," 17 U.S.C. § 504(c)(1), but as much as $50,-000 for "willful infringement." 17 U.S.C. § 504(c)(2). Plaintiff seeks the full $50,000 award, as well as attorneys' fees and costs as provided by 17 U.S.C. § 505.

The remedies of statutory damages and attorneys' fees are unavailable to Plaintiff in this action. 17 U.S.C. § 412 provides in pertinent part that

In any action under this title, other than an action instituted under section 411(b), no award of statutory damages or of attorney's fees, as provided by sections 504 and 505, shall be made for—

(1) any infringement of copyright in *an unpublished work* commenced before the effective date of its registration . . . . (emphasis supplied).

Section 411(b) provides

(b) In the case of a work consisting of sounds, images, or both, the first fixation of which is made simultaneously with its transmission, the copyright owner may, either before or after such fixation takes place, institute an action for infringement under section 501, fully subject to the remedies provided by sections 502 through 506 and section 509 and 510, if, in accordance with requirements that the Register of Copyrights shall prescribe by regulation, the copyright owner—

(1) serves notice upon the infringer, not less than ten or more than thirty days before such fixation, identifying the work and the specific time and

source of its first transmission, and declaring an intention to secure copyright in the work; and

(2) makes registration for the work within three months after its first transmission.

17 U.S.C. § 411(b).

■ The fitness trail feature is an unpublished work. "Publication" under the statute is defined as

the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending. The offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display, constitutes publication. A public performance or display of a work does not of itself constitute publication.

17 U.S.C. § 101.

To perform or display a work publicly means

(1) to perform or display it at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered; or

(2) to transmit or otherwise communicate a performance or display of the work to a place specified by clause (1) or to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times.

*Id.*

A transmission, then, is not a publication. Congress has defined "transmission program" as "a body of material that, as an aggregate, has been produced for the sole purpose of transmission to the public in sequence and as a unit." *Id.* The legislative history shows that this definition encompasses non-syndicated radio and television programs. H.R.Rep. No. 1476, 94th Cong., 2d Sess. 152, *reprinted in* 1976 U.S. Code Cong. & Ad.News 5659, 5768. Live television news broadcasts clearly fall into

the category of unpublished transmission programs.

 Plaintiff's only possibility for an award of statutory damages is thus to fit within Section 411(b). Plaintiff cannot fit within that section for two reasons. First, the fixation of the pretaped fitness trail feature did not first occur at the time of the transmission. The feature was fixed earlier, when it was pretaped. Secondly, even if one were to assume that the fixation only occurred as the broadcast was being aired, Plaintiff did not give the notice referred in Section 411(b). Therefore, statutory damages and attorneys' fees are not awardable to Plaintiff.

 By its own admission, Plaintiff has suffered virtually no actual damage from the sale of the fitness trail segment. Although WXIA makes tapes available, it does not actively attempt to market them and admits that it has no real concern that it ever sell any tapes. Its actual damages in this case therefore are trivial. Defendant sold the fitness trail segment for $55.[9] The Court did not hear evidence on News Clips' profit per tape, but estimates it at $35, also a trivial amount. Under these circumstances, Plaintiff's actual damages, including Defendant's profits, are *de minimis. See Shapiro, Bernstein & Co. v. Bleeker,* 243 F.Supp. 999 (S.D.Cal.1965), *aff'd* 367 F.2d 236 (9th Cir.1966). The Court will award damages in the amount of $35.00.

 Finally, as the prevailing party, Plaintiff seeks to recover its costs. Under former section 116 of the copyright statute, the award of costs to the prevailing party was mandatory. *Boz Scaggs Music v. KND Corp.,* 491 F.Supp. 908, 915 (D.Conn.1980). Current section 505, 17 U.S.C. § 505, commits the award of costs to the court's discretion. H.R.Rep. No. 1476 at 163 *reprinted in* 1976 U.S.Code Cong. & Ad.News at 5779. Costs may even be awarded to the losing rather than the prevailing party if the court should so determine. *Kepner-Tregoe, Inc. v. Carabio,* 203 U.S.P.Q. 124, 136 (E.D.Mich.

1979). The Court orders that no costs be awarded in this action.

### CONCLUSION

Judgment is to be entered for Plaintiff in the amount of $35.00. Each side shall bear its own costs.

---

**9.** News Clips has since raised its price per tape to $65.