973 F.2d 791
 1992 Copr.L.Dec. P 26,981, 24 U.S.P.Q.2d 1026,
20 Media L. Rep. 1626
 LOS ANGELES NEWS SERVICE, Plaintiff-Counter-Defendant-Appellee,
Robert Tur, Counter-Defendant-Appellee,
v.
Frank TULLO; Charles Bickert; Defendants-Appellants,
Audio Video Reporting Services; Defendant-Counter-Claimant-Appellant.
 No. 90-56101.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Oct. 7, 1991.
Decided Aug. 27, 1992.
 
 Jeffrey L. Graubart, Los Angeles, Cal., for defendant-counter-claimant-appellant.
 Elliot S. Ganezer, Ganezer Law Firm, Santa Monica, Cal., for plaintiff-counter-defendant-appellee.
 Appeal from the United States District Court for the Central District of California.
 Before: BROWNING, ALARCON and T.G. NELSON, Circuit Judges.
 JAMES R. BROWNING, Circuit Judge.
 
 I. Overview
 
 1
 Los Angeles News Service ("LANS") records newsworthy events on videotape and licenses television stations and networks to use all or segments of the unedited ("raw") footage in edited broadcast news stories. Audio Video Reporting Services ("AVRS") provides a video "news clipping" service: It monitors television news programs, records them on videotape and sells copies of all or segments of the tapes to interested individuals and businesses.
 
 
 2
 LANS videotaped the sites of an airplane crash and a train wreck, registered its copyrights to the tapes, and licensed certain Los Angeles-area television stations to use them on news programs. AVRS made video recordings of these news programs, which included portions of LANS's footage, and marketed the recordings.
 
 
 3
 LANS sued, claiming copyright infringement. AVRS counterclaimed, alleging LANS had fraudulently induced AVRS to provide LANS with copies of AVRS recordings by falsely promising to pay for the tapes.[1] After a bench trial, the district court entered judgment for LANS on the copyright infringement claims and awarded statutory damages of $10,000 for each infringement, a total of $20,000. The court found for AVRS on its fraud claim and awarded AVRS $346.13.
 
 
 4
 AVRS appeals, making the following claims: (1) the raw videotapes are not sufficiently original to merit copyright protection; (2) the public's First Amendment right of access to videotapes of newsworthy events, such as the crash and the wreck, precludes copyright protection for the tapes; (3) even if the tapes are copyrightable, AVRS made "fair use" of them and is therefore shielded from liability for copyright infringement; (4) even if AVRS would otherwise be liable for copyright infringement, LANS's "unclean hands" barred recovery; (5) having found AVRS liable for copyright infringement, the court should have permanently enjoined AVRS from copying LANS's copyrighted material without license from LANS, fixed the terms of a license that would permit AVRS to copy LANS's copyrighted material, and required LANS to notify AVRS when LANS's copyrighted material was broadcast; (6) the damage award was excessive; and (7) a videotape of the train wreck should not have been admitted into evidence. We affirm.
 
 
 5
 II. Raw Videotapes as Original Works of Authorship
 
 
 6
 AVRS claims LANS's raw videotapes, as opposed to the edited news stories in which portions of those tapes were combined with other footage, narrative, interview excerpts and graphics to form a television news "package," are not "original works of authorship" and thus do not merit copyright protection under § 102(a) of the Copyright Act of 1976, 17 U.S.C. §§ 101-914. Whether the raw tapes are sufficiently original to merit copyright protection is a mixed question of law and fact that we examine de novo. See Harper House, Inc. v. Thomas Nelson, Inc., 889 F.2d 197, 201 (9th Cir.1989).
 
 
 7
 AVRS argues LANS's tapes merely captured whatever was before the camera, involved no creativity or intellectual input, and so are not original works deserving copyright protection. The Supreme Court rejected a similar argument more than 100 years ago. In Burrow-Giles Lithographic Co. v. Sarony, 111 U.S. 53, 4 S.Ct. 279, 28 L.Ed. 349 (1884), the plaintiff argued a photograph of the author Oscar Wilde was not original and therefore not copyrightable because a "photograph is the mere mechanical reproduction of the physical features or outlines of some object animate or inanimate, and involves no originality of thought or any novelty in the intellectual operation connected with its visible reproduction in shape of a picture." Id. at 59, 4 S.Ct. at 281. The Court did not decide whether all photographs reflected the necessary originality, id., but held the Wilde photograph clearly was original because of the creative and intellectual decisions involved in producing it:
 
 
 8
 [The court below found that the photograph was] a "useful, new, harmonious, characteristic, and graceful picture, and that plaintiff made the same ... entirely from his own original mental conception, to which he gave visible form by posing the said Oscar Wilde in front of the camera, selecting and arranging the costume, draperies, and other various accessories in said photograph, arranging the subject so as to present graceful outlines, arranging and disposing the light and shade, [and] suggesting and evoking the desired expression...."
 
 
 9
 These findings, we think, show this photograph to be an original work of art, the product of plaintiff's intellectual invention, of which plaintiff is the author
 
 
 10
 ....
 
 
 11
 Id. at 60, 4 S.Ct. at 282.
 
 
 12
 Thirty-seven years later, Judge Learned Hand suggested the question left open in Burrow-Giles--whether all photographs are sufficiently original by their nature to merit copyright protection--had been answered in the affirmative by Bleistein v. Donaldson Lithographing Co., 188 U.S. 239, 23 S.Ct. 298, 47 L.Ed. 460 (1903), which held that chromolithographs that depicted real scenes and people, as photographs do, were copyrightable because they were "the personal reaction of an individual upon nature. Personality always contains something unique. It expresses its singularity even in handwriting, and a very modest grade of art has in it something irreducible, which is one man's alone. That something he may copyright...." Id. at 250, 23 S.Ct. at 300. In Jewelers' Circular Publishing Co. v. Keystone Publishing Co., 274 F. 932, 934 (S.D.N.Y.1921), aff'd, 281 F. 83 (2d Cir.1922), Judge Hand said, "Burrow-Giles [Lithographic] Co. v. Sarony ... left open an intimation that some photographs might not be protected.... I think that ... Bleistein v. Donaldson Lithographing Co. ... rules, because no photograph, however simple, can be unaffected by the personal influence of the author, and no two will be absolutely alike."Professor Nimmer's treatise reports that Judge Hand's statement of the law "has become the prevailing view, so that [almost] any ... photograph may claim the necessary originality to support a copyright merely by virtue of the photographers' personal choice of subject matter, angle of photograph, lighting, and determination of the precise time when the photograph is to be taken." 1 Melville B. Nimmer & David Nimmer, Nimmer on Copyright ("Nimmer") § 2.08[E], at 2-126.3 (1992 ed.) (footnote omitted).[2] We have stated before that the courts have recognized repeatedly that the creative decisions involved in producing a photograph may render it sufficiently original to be copyrightable and "have carefully delineated selection of subject, posture, background, lighting, and perhaps even perspective alone as protectible elements of a photographer's work." United States v. Hamilton, 583 F.2d 448, 452 (9th Cir.1978); see also Time, Inc. v. Bernard Geis Assocs., 293 F.Supp. 130, 142-43 (S.D.N.Y.1968) (amateur photographer's raw footage of the assassination of President John Kennedy was sufficiently original because of the creative effort involved in selecting type of camera, film, lens, area in which to shoot, time to film, and position of camera).
 
 
 13
 Whether or not every photograph or raw videotape is original and therefore copyrightable, it is clear from the record in this case that the preparation of the two videotapes at issue required the intellectual and creative input entitled to copyright protection.[3] The district court so concluded after hearing testimony, from the operator of the video camera and the pilot of the helicopter in which the camera operator flew, regarding the production of LANS's news videotapes in general and the tapes in this case in particular. The witnesses described the initial decisions about the newsworthiness of the events and how best to tell the stories succinctly and effectively; the selections of camera lenses, angles and exposures; the choices of the heights and directions from which to tape and what portions of the events to film and for how long. The camera operator described herself as "an artist. I use a paintbrush. I use the camera to tell a story."
 
 
 14
 AVRS's reliance on Cable News Network, Inc. v. Video Monitoring Services of America, Inc. ("CNN"), 940 F.2d 1471, vacated, 949 F.2d 378 (11th Cir.1991), to support its contention that under Feist Publications, Inc. v. Rural Telephone Service Co., Inc., --- U.S. ----, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991), the videotapes did not possess the required originality, is misplaced.[4] Feist stated the "requisite level of creativity is extremely low; even a slight amount will suffice. The vast majority of works make the grade quite easily, as they possess some creative spark, 'no matter how crude, humble or obvious' it might be." Feist, --- U.S. at ----, 111 S.Ct. at 1287 (citation omitted). Feist held only that a "garden-variety" telephone directory listing subscribers alphabetically by surname was not sufficiently original because the selection and arrangement was "entirely typical" and "devoid of even the slightest trace of creativity." Id. --- U.S. at ----, 111 S.Ct. at 1296-97. The Court did not disavow the century-old proposition that photographs may be copyrightable as the original products of creative and artistic decisions; rather, the Court explicitly reaffirmed Burrow-Giles, stating that "[t]he originality requirement articulated [therein] remains the touchstone of copyright protection today." Id., --- U.S. at ----, 111 S.Ct. at 1288.
 
 
 15
 III. First Amendment Preclusion of Copyright Protection
 
 
 16
 AVRS contends that even if the tapes are original enough to merit copyright protection, we should adopt a bright-line rule that no videotape of a newsworthy event is copyrightable because its creator's proprietary interest must give way to the public's First Amendment right of access to information.
 
 
 17
 Copyright law incorporates First Amendment goals by ensuring that copyright protection extends only to the forms in which ideas and information are expressed and not to the ideas and information themselves. "[T]he idea-expression dichotomy ... serves to accommodate the competing interests of copyright and the first amendment. The 'marketplace of ideas' is not limited by copyright because copyright is limited to protection of expression." Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp. ("Krofft"), 562 F.2d 1157, 1170 (9th Cir.1977); see also Harper & Row, Publishers, Inc. v. Nation Enters., 471 U.S. 539, 556, 105 S.Ct. 2218, 2228, 85 L.Ed.2d 588 (1985) ("copyright's idea/expression dichotomy 'strike[s] a definitional balance between the First Amendment and the Copyright Act by permitting free communication of facts while still protecting an author's expression' " (citation omitted)).
 
 
 18
 First Amendment concerns are also addressed in the copyright field through the "fair use" doctrine, discussed in part IV of this opinion. As we will note, First Amendment considerations are relevant in determining whether the purpose of copying a work and the nature of the work copied militate in favor of finding a given use of a particular work to be a "fair use," for which no liability should be imposed.
 
 
 19
 Professor Nimmer has suggested the idea-expression dichotomy and the fair use doctrine may not adequately protect First Amendment interests in some circumstances. 1 Nimmer § 1.10[C], at 1-81. Citing the exclusive photographs of the My Lai massacre during the Vietnam War and the Zapruder home movie of the assassination of President John Kennedy as examples, Nimmer proposes that "where the 'idea' of a work contributes almost nothing to the democratic dialogue, and it is only its expression which is meaningful," copyright protection of the expression should be limited in the interest of public access to information necessary to effective public dialogue. Id. at 1-82--1-84. Nimmer explains:
 
 
 20
 No amount of words describing the "idea" of the massacre could substitute for the public insight gained through the photographs. The photographic expression, not merely the idea, became essential if the public was to fully understand what occurred in that tragic episode. It would be intolerable if the public's comprehension of the full meaning of My Lai could be censored by the copyright owner of the photographs....
 
 
 21
 Similarly, in the welter of conflicting versions of what happened that tragic day in Dallas, the Zapruder film gave the public authoritative answers that it desperately sought; answers that no other source could supply with equal credibility. Again, it was only the expression, not the idea alone, that could adequately serve the needs of an enlightened democratic dialogue.
 
 
 22
 Id. at 1-83--1-84.
 
 
 23
 Nimmer recognizes, however, that denying copyright protection to news pictures might defeat the ultimate First Amendment goal of greater public access to information by inhibiting or destroying the business of news photography. Id. at 1-84.1--1-85. The treatise therefore suggests a news photograph in which idea and expression are inseparable should be subject to a compulsory licensing scheme unless within a month of its making, the photograph appears in the newspapers, magazines or television news programs servicing a given area. Id. at 1-85.[5]
 
 
 24
 Because there was no showing that other depictions and reports of the plane crash and train wreck were unavailable or omitted information vital to the public understanding of the events, and because the record establishes that LANS's tapes were shown on local television programs immediately after the events and thus were freely available to the public, we conclude the problem perceived by Professor Nimmer was not present in this case, and we reject, as indeed would Professor Nimmer, AVRS's contention that the First Amendment precludes liability for infringement of LANS's copyrights.
 
 IV. Fair Use
 
 25
 AVRS contends that if the videotapes are copyrightable, AVRS's use of them is protected by the doctrine of fair use, which " 'allows a holder of the privilege to use copyrighted material in a reasonable manner without the consent of the copyright owner.' " Lewis Galoob Toys, Inc. v. Nintendo of America, Inc., 964 F.2d 965, 969 (9th Cir.1992) (citation omitted). Fair use is a mixed question of law and fact. Harper & Row, 471 U.S. at 560, 105 S.Ct. at 2230. Where the district court has found facts sufficient to evaluate each of the statutory factors considered in determining fair use, as did the court here, we may determine as a matter of law whether the challenged use is a fair one. Id.
 
 
 26
 Congress has identified four nonexclusive factors as "especially relevant" in determining fair use. Id. The Copyright Act provides:
 
 
 27
 [T]he fair use of a copyrighted work ... for purposes such as criticism, comment, news reporting, teaching ..., scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include--
 
 
 28
 (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
 
 
 29
 (2) the nature of the copyrighted work;
 
 
 30
 (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
 
 
 31
 (4) the effect of the use upon the potential market for or value of the copyrighted work.
 
 
 32
 17 U.S.C. § 107.
 
 
 33
 (1) AVRS argues the district court erred in finding AVRS's use of the tapes was not a fair use because the use was commercial in character. AVRS maintains its clients used the tapes for "research, scholarship and private study," and therefore AVRS's use must be considered fair in light of Sony Corp. of America v. Universal City Studios, Inc., 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984).
 
 
 34
 Even assuming AVRS's representation of its clients' use of the tapes to be accurate, Sony does not dictate the result for which AVRS argues. Sony held distributors of videotape recorders ("VTRs") were not vicariously liable for copyright infringements allegedly committed by VTR purchasers because VTRs could be used for "private, noncommercial time-shifting [taping for later viewing] in the home," id. at 442, 104 S.Ct. at 789, and such a private, noncommercial, nonprofit activity is presumptively a fair use, id. at 449, 104 S.Ct. at 792.
 
 
 35
 Unlike the claim against the VTR distributors involved in Sony, LANS's claim against AVRS is not that AVRS is vicariously liable for alleged infringements by its customers but that it is directly liable for its own infringements. The difference is crucial: Under Sony, a VTR owner who tapes a copyrighted movie broadcast over a public television station to watch at home at a later time is protected by the fair use doctrine, but a VTR owner who tapes the movie to sell copies to others without the copyright owner's consent is subject to a range of civil and criminal sanctions. See, e.g., id. at 434 n. 15, 104 S.Ct. at 784 n. 15 ("anyone who willfully infringes the copyright to reproduce a motion picture for purposes of commercial advantage or private financial gain is subject to substantial criminal penalties"). The fact that the VTR owner's customer buys the tape to watch the movie at home at a convenient time will not shield the VTR owner from liability; the ultimate use to which the customer puts the tape is irrelevant, as is the use AVRS's customers make of the tapes AVRS sells.
 
 
 36
 Moreover, if AVRS had been sued on a theory of vicarious liability, AVRS's clients' use of LANS's footage for "research, scholarship and private study" would not automatically be deemed fair. The four statutory factors must still be considered. For the same reason, AVRS's argument that its use of the tapes was fair as a matter of law because its purpose was "private news reporting" is unavailing. Even if AVRS's characterization of its purpose was correct, it would not be dispositive:
 
 
 37
 News reporting is one of the examples enumerated in § 107 to "give some idea of the sort of activities the courts might regard as fair use under the circumstances." This listing was not intended ... to single out any particular use as presumptively a "fair" use.... The fact that an article arguably is "news" and therefore a productive use is simply one factor in a fair use analysis.
 
 
 38
 Harper & Row, 471 U.S. at 561, 105 S.Ct. at 2231 (citations omitted). In any case, AVRS is no more a "news reporter" than the VTR owner who tapes a publicly broadcast movie is a filmmaker.
 
 
 39
 AVRS's purposes are "unabashedly commercial." Pacific & S. Co., Inc. v. Duncan ("Duncan"), 744 F.2d 1490, 1496 (11th Cir.1984) ("Of course, every commercial exchange of goods and services involves both the giving of the good or service and the taking of the purchase price. The fact that [the defendant] focuses on the giving rather than the taking cannot hide the fact that profit is its primary motive for making the exchange."). In Sony, the Court emphasized that if a VTR owner copied material previously broadcast over the public airwaves for a commercial or profit-making purpose, that use "would presumptively be unfair." Sony, 464 U.S. at 449, 104 S.Ct. at 792. This factor weighs against AVRS.
 
 
 40
 (2) The second factor bearing on the availability of the fair use exception is the nature of the copyrighted work--here, videotapes of news events. "The law generally recognizes a greater need to disseminate factual works than works of fiction or fantasy." Harper & Row, 471 U.S. at 563, 105 S.Ct. at 2232; see also Sony, 464 U.S. at 454, 104 S.Ct. at 795 (interest in expanding public access to television broadcasting is factor to be considered in determining fair use); Duncan, 744 F.2d at 1497 (the "importance to society of the news could affect the definition of a fair use for a number of reasons"). This factor weighs in AVRS's favor.[6]
 
 
 41
 (3) AVRS contends the third factor, the amount and substantiality of the portion used in relation to the copyrighted work as a whole, also weighs in its favor because AVRS copied only a small portion of LANS's copyrighted footage: the "clips" included in the television newscasts AVRS recorded. Copying even a small portion of a copyrighted work may exceed the boundaries of fair use if the material taken is the "heart" of the work. See Harper & Row, 471 U.S. at 564-65, 105 S.Ct. at 2232-33 (while words quoted by copyright infringers were "an insubstantial portion" of President Ford's unpublished memoirs, they were the "heart of the book" in that they were among the most "interesting," "moving" and "powerful" passages).
 
 
 42
 Although AVRS copied only a small part of the raw footage shot by LANS, it was the most valuable part of that footage. In preparing a newscast, a television station selects the most effective and illustrative shots from the raw footage available. Thus the news programs AVRS copied included what LANS's customers thought was the best of the LANS footage--its "heart." The third factor weighs against AVRS.[7]
 
 
 43
 (4) The fourth factor, the effect of the use upon the potential market for or value of the copyrighted work, "is undoubtedly the single most important element of fair use." Harper & Row, 471 U.S. at 566, 105 S.Ct. at 2233. This factor militates against a finding of fair use if there is a "showing by a preponderance of the evidence that some meaningful likelihood of future harm exists. If the intended use is for commercial gain, that likelihood may be presumed." Sony, 464 U.S. at 451, 104 S.Ct. at 793 (emphasis deleted).
 
 
 44
 Although the AVRS and LANS markets are not identical--AVRS sells edited news stories copied from television news programs to individuals and businesses while LANS licenses television stations to use its raw footage in producing news programs--there is an overlap between the AVRS market and the potential LANS market. At least some AVRS customers might choose to buy raw footage from LANS if they could not purchase edited news stories from AVRS, and LANS might choose to sell the raw footage to them. Cf. Duncan, 744 F.2d at 1496 ("[The news clipping service] uses the broadcasts for a purpose that [the broadcaster] might use for its own benefit. The fact that [the broadcaster] does not actively market copies of the news programs does not matter, for Section 107 [of the Copyright Act] looks to the 'potential market' in analyzing the effects of an alleged infringement."). This factor also weighs against AVRS.
 
 
 45
 Only one of the four statutory factors (the nature of the copyrighted work) argues in favor of classifying AVRS's unauthorized use of LANS's copyrighted material as fair. The remainder (the commercial character of the use, the use of the most valuable part of the material, and the adverse impact upon LANS's potential market) argue strongly to the contrary. On balance, we conclude that the doctrine of fair use does not protect AVRS from liability for infringing LANS's copyrights.[8]
 
 V. Unclean Hands
 
 46
 AVRS contends the district court erred by failing to find LANS was barred from prevailing on its copyright claim because of its "unclean hands." "The application of the unclean hands doctrine raises primarily a question of fact." Dollar Sys., Inc. v. Avcar Leasing Sys., Inc., 890 F.2d 165, 173 (9th Cir.1989). We review factual findings for clear error. Lewis Galoob Toys, at 967.
 
 
 47
 AVRS maintains LANS should be barred from recovering for AVRS's copyright infringement because LANS induced AVRS to provide LANS with copies of videotapes at issue in this litigation by giving AVRS a check for $346.13 on which LANS then stopped payment. Arguably, this behavior could constitute unclean hands. See 3 Nimmer § 13.09[B], at 13-149--13-150 (defense of unclean hands has been recognized where plaintiff "obtained information as to the nature of defendant's work through unfair means"). However, the defense is rarely effective, id. at 13-148, and is properly denied when the "plaintiff's transgression is of an ... inconsequential nature," id. at 13-150 (footnote omitted). The district court did not err in concluding LANS's behavior was not sufficiently serious to bar it from recovery.
 
 VI. Injunctive Relief
 
 48
 AVRS contends the district court should have granted LANS's request for an injunction barring AVRS from copying LANS's copyrighted material without a license, and should have fixed the terms of a license that would permit AVRS to copy LANS's copyrighted material and ordered LANS to notify AVRS when LANS's copyrighted material was broadcast. AVRS opposed LANS's request initially but changed its position when the district court ruled in LANS's favor on the merits. LANS now opposes the injunctive relief it originally sought.
 
 
 49
 The district court had discretion to grant the injunction LANS requested but had no obligation to do so after LANS abandoned its request. Cf. Universal City Studios, Inc. v. Sony Corp. of America, 659 F.2d 963, 976 (9th Cir.1981) (citing Nimmer for proposition it would be abuse of discretion to deny plaintiff's request for permanent injunction after liability and threat of continuing infringement had been established), rev'd on other grounds, 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984). Neither was the court required to compel LANS to grant AVRS license to copy LANS's copyrighted material nor to protect AVRS from the possibility that without the notification provision AVRS sought, it might inadvertently copy LANS's copyrighted material and thus become liable for further substantial damages. See Universal City Studios, 659 F.2d at 976 ("In fashioning relief, the district court should not be overly concerned with the prospective harm to [defendant]. A defendant has no right to expect a return on investment from activities which violate the copyright laws. Once a determination has been made that an infringement is involved, the continued profitability of [defendant's] business[ ] is of secondary concern.").[9]
 
 VII. Damages
 
 50
 AVRS claims that because it had a good faith belief in the legality of copying the newscasts containing LANS's copyrighted material, the district court erred by awarding more than minimal damages. AVRS relies on 17 U.S.C. § 504(c)(2), which provides that "[i]n a case where the infringer sustains the burden of proving, and the court finds, that such infringer was not aware and had no reason to believe that his or her acts constituted an infringement of copyright, the court i[n] its discretion may reduce the award of statutory damages to a sum of not less than $200." The district court did not find AVRS "had no reason to believe" its acts did not constitute infringement. Even if the court had so found, § 504(c)(2) does not mandate a nominal award. On this record, the district court did not abuse its discretion by declining to reduce the award.[10]
 
 VIII. Evidentiary Ruling
 
 51
 Finally, AVRS argues the district court erred by admitting a videotape of the train wreck into evidence. "[E]videntiary rulings are reviewed for abuse of discretion and will not be reversed absent prejudice." Roberts v. College of the Desert, 870 F.2d 1411, 1418 (9th Cir.1988). AVRS argues it was prejudiced because there would have been no evidence that AVRS infringed LANS's copyright to the footage of the train wreck without the tape. AVRS is incorrect. The videographer who shot the footage testified at trial that she saw her video broadcast on a local channel; another LANS employee testified the station that broadcast on that channel had been licensed to use the footage; and AVRS's log sheets showed AVRS sold a copy of that station's newscast from the day in question to the Southern Pacific Transportation Company, whose train derailed in the wreck. This evidence was sufficient to permit the trier of fact to infer AVRS sold a copy of a news program containing LANS's copyrighted footage of the train wreck without LANS's consent, thus infringing LANS's copyright. Assuming error, AVRS was not prejudiced.
 
 AFFIRMED.[11]
 
 
 [1]
 LANS obtained copies of the infringing tapes by presenting AVRS with a $346.13 check on which LANS later stopped payment
 
 
 [2]
 The exceptions Nimmer would recognize do not apply in this case. See id. at 2-126.3--2-126.7 (suggesting a photograph of a copyrighted photograph would not be copyrightable, nor would a photograph that duplicated exactly every single element of a copyrighted photograph)
 
 
 [3]
 We do not imply the mere time and effort LANS invested in making the videotapes entitle the tapes to copyright protection; originality in the work product is required. See Feist Publications, Inc. v. Rural Tel. Serv. Co., Inc., --- U.S. ----, ---- - ----, 111 S.Ct. 1282, 1291-92, 113 L.Ed.2d 358 (1991) (rejecting the "sweat of the brow" doctrine that held mere industrious compilation deserving of copyright even if the compilation was not original)
 
 
 [4]
 CNN is not precedential even in the Eleventh Circuit since it was vacated for reconsideration by the en banc court. See Ierna v. Arthur Murray Int'l, Inc., 833 F.2d 1472, 1475 n. 4 (11th Cir.1987) (opinion vacated on rehearing is not binding precedent). The en banc court dismissed the appeal. Cable News Network, Inc. v. Video Monitoring Servs. of America, Inc., 959 F.2d 188 (11th Cir.1992) (en banc) (district court had entered permanent injunction which was not before the court so appeal was dismissed as it would not be judicious to grant relief sought)
 In any case, the CNN panel considered an injunction barring the copying of any portion of an entire newscast, which consisted of "various news stories, prerecorded segments, interviews, and weather reports" which themselves were "preexisting, collected and assembled" works, CNN, 940 F.2d at 1485, a very different issue from the copyrightability of raw footage that may be used in such a newscast. CNN found the injunction too broad because the newscast was a compilation of preexisting materials, see 17 U.S.C. § 101, and so merited copyright protection only to the extent the selection and arrangement of those materials was original. CNN, 940 F.2d at 1485-86; see also 17 U.S.C. § 103(b) ("The copyright in a compilation ... extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work...."). The tapes at issue in this case were not compilations of preexisting works or data; they were preexisting creative works that were incorporated into the kind of compilatory news programs the CNN panel discussed.
 
 
 [5]
 No court has adopted Nimmer's proposal. Those that have discussed it have found it inapplicable to the facts before them. See, e.g., Krofft, 562 F.2d at 1171 & n. 16 (defendants infringed by producing "McDonaldland" television commercials substantially similar to plaintiffs' "H.R. Pufnstuf" children's television show; court found there "may be certain rare instances when first amendment considerations will operate to limit copyright protection for graphic expressions of newsworthy events" but Nimmer exception was inapplicable because plaintiffs' work did not fit Nimmer's definition of a news photograph); Roy Export Co. Estab. of Vaduz v. Columbia Broadcasting Sys., Inc., 672 F.2d 1095, 1100 (2d Cir.1982) (defendant CBS infringed by including copyrighted film clips from several Charlie Chaplin movies in a television biography of the comedian; court stated "even if we were inclined to recognize some narrow exception [such as the one Nimmer suggests] on extraordinary facts, we would still conclude that the facts in this case could not support the invention or application of even a limited privilege" because the "showing of copyrighted films was not essential to CBS's news report of Charlie Chaplin's death or to its assessment of his place in history"); Iowa State Univ. Research Found., Inc. v. American Broadcasting Cos., Inc., 621 F.2d 57, 61 n. 6 (2d Cir.1980) (defendant ABC infringed by including in its film biography of an Olympic wrestler portions of an earlier film biography of the wrestler produced by two university students; court recognized that in the "almost unique instance" of the Zapruder film, "it is at least arguable that the informational value of that film cannot be separated from the photographer's expression" but "such situations are rare" and the student film at issue "does not fall within this limited category"); Pacific & S. Co., Inc. v. Duncan, 572 F.Supp. 1186, 1193 (N.D.Ga.1983) (defendant, a video monitoring service like AVRS, infringed television station's copyright in a news feature about a "fitness trail" at a local college; court found Nimmer's hypothesis "theoretically provocative" but inapplicable because the "soft news" story, "though informational, hardly fits in a category with film of the My Lai massacre" and because both the story and the trail itself were available for viewing), aff'd in part and rev'd in part, 744 F.2d 1490 (11th Cir.1984)
 
 
 [6]
 AVRS cites the Supreme Court's statement in Sony that "[c]opying a news broadcast may have a stronger claim to fair use than copying a motion picture," 464 U.S. at 455 n. 40, 104 S.Ct. at 795, to support its contention that the nature of the copyrighted work at issue in this case outweighs the commercial use to which it was put. AVRS takes the Sony Court's statement out of context. The Court was explaining that some copyrights are more valuable because they "govern material with broad potential secondary markets. Such material may well have a broader claim to protection because of the greater potential for commercial harm." Id. Thus, "[c]opying a news broadcast may have a stronger claim to fair use than copying a motion picture" because the potential market for copies of news broadcasts is not as great as that for copies of movies. This discussion concerns not the second factor, the nature of the copyrighted work, but the fourth factor, the effect upon the potential market for the copyrighted work
 
 
 [7]
 AVRS argues that because its service is essentially one of time-shifting, the third factor would not count against a finding of fair use even if AVRS had copied all of LANS's copyrighted footage of the train wreck and plane crash. AVRS relies on the statement in Sony that because "time-shifting merely enables a viewer to see [a televised copyrighted audiovisual work] which he had been invited to witness in its entirety free of charge, the fact that the entire work is reproduced does not have its ordinary effect of militating against a finding of fair use." Sony, 464 U.S. at 449-50, 104 S.Ct. at 792 (citation omitted). Again, AVRS's reliance on Sony is misplaced. While a viewer is "invited to witness [a telecast program] in its entirety free of charge" and may therefore do so at a time the viewer finds convenient, the viewer is not invited to sell copies of the program
 
 
 [8]
 AVRS does not qualify for the exemption from liability provided by 17 U.S.C. § 109(a), which allows the lawful owner of a copy of a copyrighted work to sell the copy. AVRS did not purchase from LANS the copies of the tapes AVRS sold, and the television stations that broadcast the tapes were only licensed to use them and could not authorize AVRS to sell them. See 17 U.S.C. § 109(d) (privilege of selling copy does not "extend to any person who has acquired possession of the copy ... from the copyright owner, by rental, lease, loan, or otherwise, without acquiring ownership of it"); Duncan, 744 F.2d at 1494 n. 6 (for purposes of 17 U.S.C. § 109, the defendant video news monitoring service "cannot be considered a newspaper clipping service because it does not purchase the copy that it sells to its clients"); see also United States v. Wise, 550 F.2d 1180, 1190-91 (9th Cir.1977) (for purposes of 17 U.S.C. § 27, predecessor to 17 U.S.C. § 109, theaters granted license to exhibit films did not own the films and so could not lawfully have sold them)
 
 
 [9]
 Nonetheless, to avoid unnecessary litigation in the future, it would be prudent for LANS to require its licensees to identify LANS's footage when it is broadcast
 
 
 [10]
 We also reject AVRS's argument that the court erred in awarding statutory damages of $10,000 rather than $5,000 for the infringement of the copyright to the plane crash footage. The argument hinges on AVRS's theory that the district court believed each of the two infringements was worth half the statutory maximum of $20,000, but that because the statutory maximum for the plane crash tape was actually $10,000, the court should have awarded LANS only $5,000 for that infringement
 There is no evidence the district court awarded $10,000 for the plane crash footage infringement based on a belief the infringement was worth half the statutory maximum; the court could simply have believed the infringement merited a $10,000 damage award.
 In any case, the statutory maximum for the infringement of the copyright to the plane crash footage was $20,000. The court found the infringement occurred on March 1, 1989, the date the statutory maximum increased from $10,000 to $20,000 under the Berne Convention. See Historical and Statutory Notes to 17 U.S.C.A. § 504 (West Supp.1992).
 
 
 [11]
 AVRS's motion to supplement the excerpts of record with material previously stricken as outside the record is denied. LANS's request for sanctions against AVRS for bringing the motion is also denied